113 N.J. Super. 371 (1971)
273 A.2d 795
SCOTT E. OATES, PLAINTIFF,
v.
EASTERN BERGEN COUNTY MULTIPLE LISTING SERVICE, INC., DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided February 11, 1971.
*373 Mr. Arthur J. Lesemann for plaintiff (Messrs. Mazer & Lesemann, attorneys).
Mr. Thomas A. Tinghino, attorney for defendant.
LYNCH, J.S.C.
Plaintiff, a real estate broker with offices in Englewood, Bergen County, New Jersey, sues to compel defendant Eastern Bergen County Multiple Listing Service, Inc. (MLS) to admit him as a member of its multiple listing *374 service[1] He is a Negro.[2] He charges that in barring him from membership defendant is engaging in an illegal combination in restraint of trade. At the outset he points to the decision in Grillo v. Bd. of Realtors of Plainfield Area, 91 N.J. Super. 202 (Ch. Div. 1966), wherein it was held that the defendant multiple listing service there involved was an illegal combination.
Although this case was instituted, tried and briefed on common law principles with respect to restraints of trade, we must also consider the recently enacted New Jersey Antitrust Act (N.J.S.A. 56:9-1 et seq.) which became effective May 21, 1970. The acts here complained of all began before the effective date of this statute. But they are of a continuing nature. Therefore the court is constrained to decide this case in the context of the New Jersey Antitrust Act, as well as under the applicable common law principles.

I

THE MULTIPLE LISTING SERVICE
The benefits of a multiple listing service to a member are substantial. They are described in 52 Cornell L.Q. 570, in a note on the Grillo case.[3] See also Grillo, supra, at 222. In *375 addition, a multiple listing service may also improve competition by making properties available to more brokers than those who have actually acquired the listings.
The area covered by defendant MLS  Eastern Bergen County  consists of 24 communities, lying between the New York boundary line on the north, Hudson County on the south, the Hudson River on the east and the Hackensack River on the west. Included therein is Englewood, where plaintiff maintains his broker's office.[4]
On April 5, 1968 plaintiff applied for membership in defendant organization. He was refused for the asserted reason that under the defendant's scheme of organization, and pursuant to a "Stockholders Agreement" entered into by all of defendant's stockholders, there were no vacancies to which plaintiff could succeed. His name was then placed on a waiting list on which there are now 12 names, plaintiff being third in order. None of such applications has been acted upon.
Under defendant's Title 14A corporate organization only stockholders can be members. Its certificate of incorporation *376 authorized the issuance of 100 shares of stock but only 54 have actually been issued.
Under the Stockholders agreement it is provided that stock may be "freely" [sic] transferred only among present stockholders, to any members of their immediate families or to principal stockholders or partners in a member's real estate firm. Such "non-family" business associate must (a) be a licensed broker, (b) have been with the firm for at least two years, and (c) have the transfer approved by at least two-thirds vote of stockholders present at a meeting (art. 1A). No stock may be transferred to persons other than the parties to the stockholders agreement without the written consent of all of such parties or their transferees (art. 1B). The agreement also provides that on the death of a stockholder, if his stock does not pass to one of the permissible transferees listed above, it is to be redeemed by the corporation and become treasury stock.
Article 7 of the stockholders agreement provides:
Issuance of New Stock: The corporation shall not issue any new stock or reissue treasury stock acquired by the corporation as long as this Stockholders Agreement is in effect. [Emphasis added]
The 54 shares originally issued by defendant went only to those who had been members of defendant's predecessor, Multiple Listing Service of the Board of Realtors of Eastern Bergen County, Inc (hereafter Board of Realtors MLS). However, one of said members died before the present corporation was actually formed. His one share of stock was purchased by the president of the corporation and turned over to it as treasury stock. At a later date another member retired and turned his stock in to the corporation. Since those two shares of stock are now in the treasury, they have not been reissued, in obedience to article 7 of the stockholders agreement. Therefore, at present there are only 52 members on the roster of defendant, two less than originally anticipated. Further, in February 1970 another member indicated his intention to withdraw from the service, has not *377 paid his dues since March 1970, and has not been treated as an active member since that time. Two other members have announced their intention to resign or retire in the near future, all as evidenced in the minutes of defendant corporation of June 11, 1970 and November 13, 1970. If these last three people are deemed not to be members, then there are five fewer than originally contemplated. Yet, says defendant, there are now "no vacancies" in defendant's membership.
It is thus incontrovertible that defendant's organization has created an "exclusive club" whose membership is limited to the original stockholders, members of their immediate families, and former associates with the qualifications recited above. If the stockholders agreement is permitted to be literally enforced, no one other than those recited will become a member of defendant's organization.
Defendant asserts that since, under its stockholders agreement, it is prohibited from issuing any new or treasury stock and since plaintiff fails to meet the qualifications of article 1A and cannot acquire stock, he is barred from membership in defendant's organization.

II

The history and operation of defendant's multiple listing service
Defendant corporation was established in 1967, purportedly, so it is said, to avoid the effects of the Grillo decision in 1966.
Until 1967 the members of defendant corporation operated as an adjunct of the Board of Realtors of Eastern Bergen County (under the corporate name of Multiple Listing Service of the Board of Realtors of Eastern Bergen County, Inc.)  hereafter Board of Realtors MLS. That board was a local branch of the New Jersey Association of Real Estate Boards (NJARB) which, in turn, was affiliated with the National Association of Real Estate Boards (NAREB).
*378 In early 1966 the attorneys for NJARB advised the state president that a one-year waiting period for board members to be eligible for MLS membership (as required by defendant's predecessor, Board of Realtors MLS) was in violation of the law, by virtue of the then recent Grillo decision. In addition, the secretary of the New Jersey Association advised the Board of Realtors MLS that it should either (a) revert to a corporate status separate from the Board of Realtors and remove the term "Realtor" from its name or (b) become a complete adjunct of the Board of Realtors and permit all board members to participate in multiple listing. (This latter effect was what was ordered by Judge Herbert in the Grillo decision). The president of the state board in a subsequent letter affirmed this position. On May 11, 1966 a letter was received by the Board of Realtors MLS enclosing suggested by-laws which would make it completely subject to the Board of Realtors for Eastern Bergen County.
The members of defendant's predecessor rejected adoption of the latter form. They thereupon decided that a severance would be effected between the local Board of Realtors and its multiple listing service. Defendant's trial brief also asserts that it was the intent that the service would operate within the spirit as well as the dictates of the Grillo decision.
In early 1967 the Board of Realtors MLS was dissolved and the present defendant, Eastern Bergen County Multiple Listing Service, Inc., was organized. Each of the members of the prior organization elected to participate in the new corporation. One share of stock was issued to each of the members of the prior organization.
The Stockholders Agreement restricting transfer of stock, as set forth above, was signed and became a basic part of the corporate organization of defendant. More specifically relevant to the issue here, that agreement became the device whereby membership was limited to the original 54 members and to that select group to whom transfer was permitted. It furnishes the mechanism which has stood to bar *379 plaintiff and other new members from participating in the MLS in the area involved.
Article XII of the Operating Procedure originally adopted by the instant defendant provided that:
Listing in the service shall not be disclosed to brokers not associated with the service without the consent in writing of the listing broker; the broker is permitted to disclose his own listings to a broker not associated with the service. Brokers associated with the service are prohibited from cooperating with brokers not associated with the service for a period of ten days after publication date of the listing by the service.
In September 1968, after plaintiff had been denied admission to the service and after his attorney had written to defendant concerning the rejection, defendant amended the foregoing provision of article XII by eliminating the last sentence thereof. However, there persisted the provision that a listing broker could disclose only his own listings to a nonmember. A member broker still is prohibited from disclosing listings, other than his own, to nonmembers.
Defendant claims that, in fact, its members have fully cooperated with nonmembers, including plaintiff, and that such cooperation has accounted for approximately 5% of the gross sales per year by defendant's members, so that in the years 1969 and 1970 over $1,000,000 in sales were accomplished in cooperation with nonmember brokers. Of this "cooperation" more, infra (VI (A)).
Defendant also asserts that it ought to escape the condemnation of the Grillo decision because in Grillo the membership of the board included the great majority of the active real estate brokers and salesmen in the territory of the board. In the area here involved, i.e., Eastern Bergen County, so it is said, defendant's members constitute only about 16% of the brokers' offices in the area. It is stipulated that approximately 20% of the total gross business in the area is consummated by defendant's members. Thus, argues defendant, the concept of "monopoly" which ran through *380 the Grillo decision is absent here.[5] But as to this argument, see VI (B) (1) below.

III

PLAINTIFF'S OPERATION
Plaintiff has been a licensed real estate broker since 1967, and since 1968 has operated his own business in Englewood. Practically all of his business is with negroes. He has one full-time saleswoman. Approximately 271 listings were available to members of the defendant's MLS at the time of trial, but plaintiff had only 21 listings in his office. Five of them were exclusively his, eleven were open listings and ten were cooperatives obtained from other brokers. Plaintiff's listings were primarily in black neighborhoods of Englewood and Teaneck, the municipalities where his business is concentrated.

IV

THE EFFECT UPON PLAINTIFF'S MEANS OF LIVELIHOOD BY REASON OF HIS EXCLUSION FROM MLS
As against the advantages which would be plaintiff's were he a member of the defendant MLS, what are the realities of *381 his situation as a nonmember? If a prospective buyer comes to him, that buyer will state his needs with respect to the location and type of house he desires, the number of rooms, taxes, heating costs, and other characteristics, as well as a price range within which he might purchase. A broker's knowledge of available property is his "stock in trade." Myers v. Arcadio, Inc., 73 N.J. Super. 493 (App. Div. 1962). To supply a buyer's needs plaintiff has only his own meager listings, with the remote possibility of finding a member of defendant's organization who may have a listing of his own which would suit the buyer's needs. But how does plaintiff learn that a particular member has a listing to suit his prospective buyer's needs? Only if he had seen such a property advertised or, perchance, in passing a house similar to his buyer's needs he had seen a sign giving the name of the listing broker. Obviously, plaintiff's chances of obtaining a property to satisfy his buyer by these means are minimal. The court finds that the so-called "cooperation" with a nonmember which defendant organization will permit, i.e., by a listing broker with respect to his own listings, is illusory.
What is plaintiff's situation insofar as he may obtain listings of his own? One about to sell his house naturally desires the widest market exposure possible. If he were to list the property with plaintiff, such promotion would be limited to that provided by plaintiff and his one employee-sales-woman. On the other hand, if plaintiff were a member of MLS, his property would be promoted by being listed with the 52 offices of defendant, its 132 brokers and 299 salesmen. It is likely, then, that a prospective seller would list his property with plaintiff rather than a member of MLS? Res ipsa. Further, plaintiff has difficulty in obtaining salespeople who themselves might supply listings to his office. Of course, a prospective salesman would prefer the wider opportunities in an MLS office.
Reducing the instant issue to the realities of the situation we find that plaintiff's success in obtaining listings or locating properties for sale  his "stock in trade"  is governed and *382 limited by his own efforts, contacts and abilities. He has only a limited supply of "shoes on the shelves." His commissions on selling are limited by that supply, and if buyers come to him to find out what he has to sell the same limitations apply. On the other hand, the members of defendant corporation are not limited by their own efforts, contacts and abilities in the stock on hand. Rather, by reason of their membership in the MLS each such member broker has available to him not only the listings which he himself has obtained but also those obtained by more than 50 fellow members in the MLS and over 400 salespeople associated with them.
The court finds that (1) by plaintiff's exclusion from the MLS, competition is restrained; (2) plaintiff is deprived of the opportunity to compete; (3) to a substantial degree he is deprived of an opportunity to make his own living, and (4) under defendant's organization its members have engaged in a "concerted refusal to deal" in the classical sense. There remains the question as to whether defendant's combination, which produces these results, is an illegal restraint of trade.

V

APPLICATION OT THE CONCEPT OF "PER SE" ILLEGALITY
In Grillo Judge Herbert, by way of background to his thorough analysis, highlighted those federal decisions under the Sherman Antitrust Act (15 U.S.C.A. § 1 et seq.) which dealt with "concerted refusals to deal" and "group boycotts" and wherein such combinations were held to be illegal per se. Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), and Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1962). Such a concept of per se illegality would have precluded the necessity of determining illegality by applying a standard of "unreasonableness" *383 and of inquiring at all into the substantiality of the harm caused by the offending practices or into the business excuse for their use. See Grillo, supra, at 219, citing Northern Pac. R. Co. v. United States, 356 U.S. 1, 5, 7-8, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). However, because he considered the matter novel, Judge Herbert chose to rest his decision not on the per se concept but upon a finding that the combination before him was an "unreasonable" restraint of trade and therefore illegal at common law.
Because of Grillo the issue presented here is no longer novel, and, in our view, application of the per se concept is now called for in New Jersey. This is particularly so since the adoption of the New Jersey Antitrust Act, L. 1970, c. 73, N.J.S.A. 56:9-1 et seq., which had not been adopted at the time of Grillo. Modeled directly on section 1 of the Sherman Act (15 U.S.C.A. § 1) that act provides:
Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, in this State, shall be unlawful.
It further provides (N.J.S.A. 56:9-18):
This act shall be construed in harmony with ruling judicial interpretations of comparable Federal anti-trust statutes and to effectuate, insofar as practicable, a uniformity in the laws of those states which enact it.
Thus, there have been drawn into the stream of New Jersey's "public policy" the federal decisions which apply the per se doctrine.
Since defendant has attempted to shield its operations in a cloak of reasonableness (a concept which affords no imprimatur to a per se violation) the matter should first be examined to determine whether a per se concept should be applied. Therefore, to put the matter in proper focus, the federal decisions applying the per se classification should be re-examined to determine the relevance of the philosophy of those cases to the facts before us.
*384 In Associated Press, supra, a cooperative association engaged in gathering and distributing news in interstate and foreign commerce prohibited service of AP news to nonmembers, prohibited members from furnishing spontaneous news to nonmembers, and empowered members to block membership applications of competitors. Among other provisions, the by-laws of AP required that each member should promptly furnish to the association all of the news of such member's district; all members were prohibited from selling their news to any agency or publisher except to AP. No news was to be made available by any member to any nonmember. The court said:
The joint effect of these By-Laws is to block all newspaper nonmembers from any opportunity to buy news from AP or any of its publisher members. Admission to membership in AP thereby becomes a prerequisite to obtaining AP news or buying news from any one of its more than twelve hundred publishers. The erection of obstacles to the acquisition of membership consequently can make it difficult, if not impossible, for non-members to get any of the news furnished by AP or any of the individual members of this combination of American newspaper publishers. [326 U.S. at 9, 65 S.Ct. at 1419]
Is not this the operative effect of defendant's organization?
In AP the Court further said (at 10, 65 S.Ct. at 1419): "Historically, as well as presently, applicants who would offer competition to old members have a hard road to travel." And,
The net effect is seriously to limit the opportunity of any new paper [sic] to enter these cities. Trade restraints of this character, aimed at the destruction of competition, tend to block the initiative which brings newcomers into a field of business and to frustrate the free enterprise system which it was the purpose of the Sherman Act to protect. [at 13, 65 S.Ct. at 1421]
Is not this what has happened here?
The defendant in AP argued that an owner of property can choose his associates and can, as to that which he has produced by his own sagacity, efforts and ingenuity, decide *385 for himself whether and to whom to sell or not to sell. The court answered:
While it is true in a very general sense that one can dispose of his property as he pleases, he cannot "go beyond the exercise of this right, and by contracts or combinations, express or implied, unduly hinder or obstruct the free and natural flow of commerce in the channels of interstate trade." * * * Victory of a member of such a combination over its business rivals achieved by such collective means cannot consistently with the Sherman Act or with practical, everyday knowledge be attributed to individual `enterprise and sagacity'; such hampering of business rivals can only be attributed to that which really makes it possible  the collective power of an unlawful combination. [at 15, 65 S.Ct. at 1422 emphasis added]
In Klor's, supra, the defendant chain of department stores, national retailers and their distributors were found to have conspired among themselves either not to sell to plaintiff retail store or to sell to it only at discriminatory prices. The court labeled this combination a "concerted refusal to deal" with the plaintiff which seriously handicapped its ability to compete, and classified it as a per se violation, saying:
Group boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category. They have not been saved by allegations that they were reasonable in the specific circumstances, nor by a failure to show that they "fixed or regulated prices, parcelled out or limited production, or brought about a deterioration in quality." Fashion Originators' Guild v. Federal Trade Comm'n, 312 U.S. 457, 466, 467-468, 61 S.Ct. 703, 85 L.Ed. 949. Cf. United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700. Even when they operated to lower prices or temporarily to stimulate competition they were banned. For, as this Court said in Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 213, 71 S.Ct. 259, 95 L.Ed. 219, "such agreements, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment." Cf. United States v. Patten, 226 U.S. 525, 542, 33 S.Ct. 141, 57 L.Ed. 333. [359 U.S. at 212, 79 S.Ct. at 709; emphasis added]
Applying these principles to the case before it, the court held:
*386 This combination takes from Klor's its freedom to buy appliances in an open competitive market and drives it out of business as a dealer in the defendants' products. * * * It clearly has, by its "nature" and "character," a "monopolistic tendency." As such it is not to be tolerated merely because the victim is just one merchant whose business is so small that his destruction makes little difference to the economy. Monopoly can as surely thrive by the elimination of such small businessmen, one at a time, as it can by driving them out in large groups. In recognition of this fact the Sherman Act has consistently been read to forbid all contracts and combinations "which `tend to create a monopoly,'" whether "the tendency is a creeping one" or "one that proceeds at full gallop." International Salt Co. v. United States, 332 U.S. 392, 396, 68 S.Ct. 12, 92 L.Ed. 20. [at 213-214, 79 S.Ct. at 710]
I consider that philosophy applicable here.
In Silver the New York Stock Exchange denied to the plaintiff nonmembers of the Exchange a right to have a direct wire telephone connection with members. The court held that removal of the wires by collective action of the Exchange constituted a per se violation of the Sherman Act, and said:
The concerted action of the Exchange and its members here was, in simple terms, a group boycott depriving petitioners of a valuable business service which they needed in order to compete effectively as broker-dealers in the over-the-counter securities market. [373 U.S. at 347, 83 S.Ct. at 1252 emphasis added]
Without such services, the court noted, the nonmember dealer is hampered substantially in his business; he loses a significant volume of trade with other members of the network, and these important business advantages are taken away from him.
Just as the concerted action of the defendants in refusing to deal with other traders in AP, Klor's and Silver, all supra, deprived plaintiffs therein of an opportunity to sell their "stock in trade," and tended to deprive them of their means of livelihood, so too does the defendant's operation here, by similar concerted action, deny to plaintiff access to a substantial part of the product in which he deals  *387 listings of property. The restraint cripples the freedom of this plaintiff-trader and hampers his ability to sell in accordance with his judgment. United States v. Patten, 226 U.S. 525, 542, 33 S.Ct. 141, 57 L.Ed. 333 (1913). In a federal anti-trust context, it would have sufficient "pernicious effect" to come within the "per se" classification. The "pernicious effect" is no less present here. The lessening of competition  a public evil  is incontrovertibly present. And the deprivation of plaintiff's access to properties which he could sell, and which are hidden from him by the MLS operation, obviously deprives him of the right to compete with respect to those hundreds of properties.
This court sees no reason why the federal concept of per se illegality should not be applied here. The common law is not constant. It must yield as the needs require. And the dominant factor in molding and remolding common law principles is "public policy" so that the common law may soundly serve public welfare and true interests of justice. Falcone v. Middlesex County Medical Society, 34 N.J. 582, 589 (1961). The public policy here controlling has been expressed in the New Jersey Antitrust Act. Therefore, the court holds that defendant's combination in restraint of this plaintiff-trader is illegal per se.
Further, defendant's combination and its action in excluding plaintiff from membership violates another aspect of public policy, one which was recognized by our Supreme Court in Falcone v. Middlesex County Medical Society, supra. There plaintiff doctor was excluded from membership in defendant medical society. The Society's refusal to admit him to membership had "seriously adverse economic and professional effects on Dr. Falcone." 34 N.J. at 586. The Society contended that it was a "voluntary" organization which was at liberty to prescribe its own rules, and that Dr. Falcone had "no judicially enforceable right to admission to membership."
Falcone recognized that courts have been understandably reluctant to interfere with the internal affairs of membership *388 associations but "where the considerations of policy and justice were sufficiently compelling judicial scrutiny and relief were not found wanting; * * *." 34 N.J. at 590. Speaking for the court, Justice Jacobs said:
In Trautwein v. Harbourt, 40 N.J. Super. 247, 59 A.L.R. 2d 1274 (App. Div. 1956), certification denied, 22 N.J. 220 (1956), the court recently dealt with an action for damages by plaintiffs who alleged they were maliciously denied admission to membership in the Order of the Eastern Star, a fraternal organization of New Jersey. In rejecting the plaintiffs' claim for relief the court (see 40 N.J. Super., at pp. 264-265) differentiated the expulsion cases and distinguished exclusion cases involving organizations "membership in which is an economic necessity" or "those which are repositories of civic, civil or political rights." See Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944). We are here in nowise concerned with a social or fraternal organization such as the Order of the Eastern Star. [at 591-592]
And he set the public policy polestar as follows:
We are here concerned with and therefore deal solely with an organization, membership in which may here, in the language of Trautwein, be viewed as "an economic necessity"; in dealing with such an organization, the court must be particularly alert to the need for truly protecting the public welfare and advancing the interests of justice by reasonably safeguarding the individual's opportunity for earning a livelihood while not impairing the proper standards and objectives of the organization. [at 592; emphasis added]
Justice Jacobs went on to say:
The persistent movement of the common law towards satisfying the needs of the times is soundly marked by gradualness. Its step by step process affords the light of continual experience to guide its future course. See Walker, Inc. v. Borough of Stanhope, 23 N.J. 657, 666 (1957). When courts originally declined to scrutinize admission practices of membership associations they were dealing with social clubs, religious organizations and fraternal associations. Here the policies against judicial intervention were strong and there were no significant countervailing policies. When the courts were later called upon to deal with trade and professional associations exercising virtually monopolistic control, different factors were involved. The intimate personal relationships which pervaded the social, religious and fraternal organizations were hardly in evidence and the *389 individual's opportunity of earning a livelihood and serving society in his chosen trade or profession appeared as the controlling policy consideration. Here there have been persuasive indications, as noted earlier in this opinion, that in a case presenting sufficiently compelling factual and policy considerations, judicial relief will be available to compel admission to membership; we are entirely satisfied, as was Judge Vogel in the Law Division, that Dr. Falcone has presented such a case. See Falcone v. Middlesex County Medical Soc., supra, 62 N.J. Super. 184 [at 596]
So here.
The court finds that defendant's operation constitutes a combination in restraint of trade, unlawful per se under the New Jersey Antitrust Act (N.J.S.A. 56:9-1 et seq.), the federal precedents incorporated therein, and the public policy of Falcone, supra, that a man's opportunity to make a livelihood shall not be restrained by concerted action.
Since we have decided that defendant's organization constitutes a combination which is unlawful per se, there is no necessity for inquiring into its "reasonableness," the "business reasons" for its activities (cf. United States v. Arnold, Schwinn & Co., 388 U.S. 365, 375, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967)), or the extent of the market which it affects. United States v. Associated Press, supra. Nevertheless, in the interest of disposing of all contentions made by defendant, and as an alternative ground for its decision, the court shall here pass upon those factors.

VI

DEFENDANT'S COMBINATION UNDER THE "RULE OF REASON"

(A)

ALLEGED "COOPERATION"
Defendant attempts to distinguish the Grillo decision on the ground that in the Plainfield area there was an absolute prohibition against cooperation by members of the MLS with nonmembers, while here, it is said, cooperation is not only permitted but is encouraged. Therefore it is argued that the *390 invidious "refusal to deal" in Grillo is not present here. We have already described this "cooperation" as "illusory."
In support of its contention defendant asserts that, upon occasion, members of the defendant have cooperated with plaintiff regarding the sale of individual houses and that, in fact, plaintiff has never been refused cooperation by a member of defendant on any specific occasion. There is evidence here that there has been cooperation between defendant's members and plaintiff with respect to ten properties. However, it is noticed that most of these properties were in black areas and, in all but two, cooperation was solicited by plaintiff after he happened to discover who was the listing broker for the property involved. True, at trial plaintiff was unable to identify any of defendant's members who have refused cooperation to plaintiff where the member solicited was the listing broker. But the problem confronting plaintiff  and any nonmember  is to find out who the listing broker is. Such cooperation as is offered, as we have said, is an unreal concept, for a member cannot discover a listing through any but the listing broker and that broker's name can only be discovered by purest happenstance. The thrust of plaintiff's complaint in this respect is that cooperation with respect to the mass of listings in the files of defendant is denied to him. The "token" cooperation offered by defendant falls far short of satisfying that complaint.

(B)

DEFENDANT'S "JUSTIFICATION" FOR ITS RESTRICTED MEMBERSHIP
Defendant says that restriction of its membership is justified for these reasons: (1) the limitation to 54 members and the restrictive provisions of the stockholders agreement with respect to further admissions to membership were adopted to eliminate what defendant conceives to have been held objectionable in the Grillo case, i.e., the fact that the membership of the defendant board there included "the great majority *391 of active real estate brokers and salesmen in the territory of the Board" (cf. Grillo, 91 N.J. Super. at 207) thus tending [sic] to establish a "monopoly" (Grillo, at 218); (2) to eliminate the requirements for admission to membership which were held to be too restrictive in Grillo (the requirements of one-year membership in the board of realtors, approval of two-thirds of the executive committee and of the membership of that body, admission charge of $1,000, and six months' probationary period after admission); (3) for administrative reasons, in that a smaller number of members allegedly is "easier to handle" and avoids hiring of extra help, buying of more equipment, and thus incurring greater expenses.

(1) SUBSTANTIALITY OF IMPACT
As to reason No. 1, defendant argues that it is neither a monopoly nor a near-monopoly, and that therefore the anti-trust laws are not applicable to it. It contends that since its members comprise only 16% of the real estate brokerage offices and 20% of the volume of sales made yearly in the area, any restraint of trade occasioned by its operations is "merely incidental, casual, and unmaterial [sic]." Lawson v. Woodmere, Inc., 217 F.2d 148 (4 Cir.1954), and lacks a sufficiently "substantial impact on trade" to be held unlawful.
I feel, as did Judge Herbert in Grillo, supra, that the illegality of the defendant's operation is its tendency to destroy competition, rather than its mere size or market share. Nevertheless, I find that the restraint of trade is a "substantial" one, in that plaintiff is being denied free access to approximately 20% of the dollar volume of sales produced in the area per year (some $20,000,000 plus). Therefore, even if "substantiality" of impact were necessary to establish illegality, it appears here. "Monopoly" need not exist for the courts to act against restraints of trade. Rather, the prohibited combination is one which "has or may have a *392 tendency toward preventing competition * * *." (emphasis added) Grillo, supra, at 218, plus authorities cited therein.

(2) RESTRICTIVE ADMISSIONS REQUIREMENTS
As to reason No. 2 (eliminating the requirements for admission in the Plainfield MLS as considered in Grillo), I find great difficulty in following defendant's logic. The Plainfield MLS had established standards which, if met, mandated admission to membership. However stringent they may have seemed, they were at least possible of fulfillment. On the other hand, defendant has eliminated all such standards as would qualify one for membership. Except for the permitted transfer among family members or business associates provided by article 1A of the Stockholders Agreement, no one can become a member without the written consent of 100% of the members (art. 1B). In Plainfield, approval of only two-thirds of the executive committee and of the membership was required.
Realistically, defendant has created what is an absolute bar to admission of new members  no matter what their qualifications. How this can logically be said to ameliorate the evils which Grillo found in the Plainfield qualifications is completely beyond me. The purpose of the Grillo holding was to make membership more readily attainable, not less. No matter what defendant's intent here may have been, the effect of the change it has made is that membership is now totally closed to outsiders. As such, it flies in the face of the Grillo mandate.

(3) ADMINISTRATIVE CONVENIENCE
As to reason No. 3, i.e., "business reasons," the only testimony which purports to justify the limitation in the number of members to 54 lies in the testimony of Mr. Tulp, one of defendant's officers. He opined that the "ideal" operation of a multiple listing service would be "somewheres around 40" because "it is easier to handle." He said he knew of *393 several other multiple listing services in New Jersey whose membership ranged from 12 in the South Bergen Board of Realtors to 100 in Passaic County. Other than this naked opinion  a "net opinion," cf. Parker v. Goldstein, 78 N.J. Super. 472, 483 (App. Div. 1963)  there is no support in the record which demonstrates that the limitation in number of members is necessary or even beneficial. Incidentally, it is interesting to note that the National Association of Real Estate Boards has included in by-laws which it has promulgated to its member boards a provision with respect to the numbers aspect of multiple listing services. In the note at 52 Cornell L.Q. 570 it is said:
These By-laws include recommendations for operating multiple listing services, most significant of which is contained in Article 1, Section 2: "The member board shall not apply any arbitrary numeric or other inequitable limitation on its members." The official interpretations by the N.A.R.E.B. Board of Directors dealing with this section, while not mandatory, serve as useful guides toward understanding what are deemed "inequitable limitations." [at 571]
It may be that there ought to be some limitation in number with respect to the proper administration of a multiple listing service. But there is no proof in this record to establish any such standard. As a matter of fact, defendant's corporation itself has projected a standard of sorts in that provision of its certificate of incorporation which authorized the issuance of 100 shares of stock. It would thus seem to have been contemplated that a membership of 100 would not be too cumbersome. If the ceiling of 100 permitted by the certificate were recognized  since only 54 members have been admitted  all 12 applicants now on the waiting list would be admitted  subject, of course, to possible objections to such applicants on the merits of their qualifications.
"Good business practices" will not justify an otherwise unlawful combination. In United States v. Arnold, Schwinn & Co., supra, defendant contended that it acted to promote "good business practices" and "to compete more *394 effectively in the market." The Supreme Court affirmed plaintiff's verdict below saying:
Our inquiry is whether, assuming nonpredatory motives and business purposes and the incentive of profit and volume considerations, the effect upon competition in the marketplace is substantially adverse. The promotion of self-interest alone does not invoke the rule of reason to immunize otherwise illegal conduct. [388 U.S. at 375, 87 S.Ct. at 1863 emphasis added]
Defendant's concerted "refusal to deal" with nonmembers is such "otherwise illegal conduct." We know of no authority in the federal antitrust experience which would allow administrative convenience, which is proffered by defendant here, as a justification for its concerted refusal to deal.
Note, however, that N.J.S.A. 56:9-5 provides:
a. This act shall not forbid the existence of trade and professional organizations created for the purpose of mutual help, and not having capital stock, nor forbid or restrain members of such organizations from lawfully carrying out the legitimate objects thereof not otherwise in violation of this act; nor shall those organizations or members per se be illegal combinations or conspiracies in restraint of trade under the provisions of this act [Emphasis added]
The court finds that defendant does not come within the scope of this exemption, not only because it has issued capital stock, but also because its activities are "otherwise in violation" of the act.

CONCLUSION
For the foregoing reasons we hold that defendant's operation and use of the organizational provisions quoted herein constitutes an unlawful combination in restraint of trade. The court therefore directs that (1) paragraphs 1A, 1B and 7 of the stockholders agreement and paragraph 12 of the operating procedure are declared to be null and void, and (2) plaintiff be forthwith admitted as a member of defendant corporation upon the same terms and conditions as all other members.
*395 The court retains jurisdiction (a) for the purpose of trying the issue of damages (issues to be framed at further pre-trial conference), and (b) for such other purpose as may be necessary in the implementation of the decision herein made.
No costs at this time.
NOTES
[1] Trial has been bifurcated. Liability only has been tried, leaving damages for later time.
[2] Plaintiff concedes that he has no proof that his exclusion was racially motivated. However, all members of defendant MLS are white.
[3] "The Practice of Multiple Listing

Multiple listing is defined as `an arrangement among real estate board * * * members whereby each broker brings his listings to the attention of other members so that if a sale results, the commission is divided between the * * * (listing broker and the selling broker), with a small percentage going to the board.'[1] [Unger, Real Estate Principles and Practices 434 (1959).] To effectuate the arrangement, multiple listing agreements are obtained with property owners, giving to all board members jointly the exclusive right to sell the listed property. Once obtained, the agreement must be filed with the board within a specified number of days. Information concerning the property is then relayed to all members, after which any member may offer the property to a prospective buyer.
(1) Benefits and Drawbacks. By exposing the listings of each member to the sales efforts of every other member, multiple listing benefits both sellers and buyers. Sellers have their property offered in a number of offices, thus reaching a wider market in a shorter period of time, while buyers are provided with a convenient means of selecting property to fit individual needs without having to shop from office to office. Competition as well as efficiency can be enhanced by multiple listing. `(O)ne of the most important functions of a MLS (multiple listing system) is to provide the small realestate office with a diversified inventory of properties which will meet the needs of all but the most highly discriminating buyers,' thus providing `the small office with inventory and promotion potentials equal to those of the larger firms * * *'[2] [Case, Real Estate Market Behavior in Los Angeles  A Study of Multiple Listing System Data 49 (1963).]" (Emphasis added)
[4] Seven of defendant's members are also members of the Central Bergen Multiple Listing Service. The extent of that participation is minimal and does not materially affect the instant case.
[5] Defendant's members represent 16% of the real estate offices in the area (53 of a total of 324); 35% of the licensed brokers (132 of a total of 370); 46% of the licensed salesmen (299 of a total of 645), and 42% of the total sales personnel (brokers and salesmen) (431 of a total of 1951).

As to sales volume consummated through defendant's MLS we find the following as fact:

 Year No. of Sales Dollar Volume
 1967 794 $21,561.655
 (1967 figures include two months' operations of
 defendant's predecessor corporation.)
 1968 765 22,792.927
 1969 639 21,357,489

The number of defendant's listings of homes for sale for each of the years 1967 through 1969 were as follows:

 1967  1573 listings
 1968  1333 "
 1969  1075 "