BARROWS v GRAND RAPIDS REAL ESTATE BOARD

1. MONOPOLIES—RESTRAINT OF TRADE—REAL ESTATE BOARDS—MULTI-
   PLE LISTING SERVICES—STATUTES—VIOLATION.

   A real estate board's multiple listing service does not violate the
   common law or the Michigan statutes relating to monopolies
   and restraint of trade where the multiple listing service is an
   integral part of the board's membership and service, there is
   evidence of substantial competition between board members
   utilizing the multiple listing service, there is evidence of sub-
   stantial competition between board members and non-board
   members in order to obtain listings and in the sale of proper-
   ties already listed, there is no evidence or claim made of any
   discrimination on applications for membership to the board,
   and, the multiple listing service in and of itself does not
   constitute a restraint of trade tending to become a monopoly.

2. MONOPOLIES—RESTRAINT OF TRADE—PER SE ILLEGALITY RULE—
   RULE OF REASON—APPLICABILITY.

   The per se illegality rule is applicable only to those restraint-of-
   trade cases which exhibit severe restraints of trade with little
   or no public benefit and where anti-competitive effects are
   conclusively presumed to flow from the actions complained of;
   in all other cases the rule of reason applies.

3. MONOPOLIES—RESTRAINT OF TRADE—ACTION—SPECIAL INJURY—
   PROXIMATE CAUSE—GENERAL DAMAGE.

   A plaintiff, in order to establish a cause for relief by reason of a
   violation by a defendant of the laws on restraint-of-trade must
   allege that such violation was the proximate cause of special
   injury to his business or property as distinguished from injury
   to other persons or to the public; it is not enough to allege

REFERENCES FOR POINTS IN HEADNOTES

[1, 4] 54 Am Jur 2d, Monopolies, Restraints of Trade and Unfair
   Trade Practices § 586.
[2] 54 Am Jur 2d, Monopolies, Restraints of Trade and Unfair Trade
   Practices §§ 30, 32, 107, 446.
[3] 54 Am Jur 2d, Monopolies, Restraints of Trade and Unfair Trade
   Practices §§ 346, 636.
[5–7] 29 Am Jur 2d, Evidence §§ 250, 269.

something forbidden by the laws and to claim general damage resulting therefrom.

4. MONOPOLIES—RESTRAINT OF TRADE—REAL ESTATE BOARDS—MULTIPLE LISTING SERVICES.

A real estate board's multiple listing service is not per se unlawful because of a refusal to deal with a nonmember real estate broker, where there is no evidence of any purpose or intent to injure nonmember competitors.

5. EVIDENCE—REBUTTAL EVIDENCE—WORDS AND PHRASES.

Rebuttal evidence is broadly defined as that given by one party to contradict, repel, explain or disprove evidence produced by the other party and tending directly to weaken or impeach it.

6. EVIDENCE—REBUTTAL EVIDENCE—ADMISSIBILITY—DISCRETION.

It is a general rule that whether evidence which could have been offered before resting may be given in rebuttal is a matter within the discretion of the trial court, because the line of demarcation in practical application between rebuttal evidence and that which should properly be given in chief before the prosecution rests is frequently more or less obscure.

7. EVIDENCE—RESTRAINT OF TRADE—REBUTTAL EVIDENCE—DISCRETION.

Excluding a plaintiff's proffered rebuttal testimony in an action for restraint of trade as to the operation of real-estate multiple-listing services in New Jersey to rebut expert testimony regarding the operation of real-estate-board listing services in Michigan was not an abuse of discretion where the plaintiff had elicited during cross-examination of the expert witness, and put on the record, substantially all that he hoped to show through rebuttal, and where admission of the rebuttal testimony might have entailed surrebuttal evidence as to the operation of such systems in the remaining states.

Appeal from Kent, Stuart Hoffius, J. Submitted Division 3 November 6, 1973, at Grand Rapids. (Docket No. 13618.) Decided January 14, 1974. Leave to appeal granted, 392 Mich —.

Complaint by Ralph E. Barrows against the

Grand Rapids Real Estate Board for an order that the continued operation of the board's multiple listing service in its then current form be enjoined and that the board be ordered to permit all brokers licensed by the state to participate in the service. Judgment for defendant. Plaintiff appeals. Affirmed.

*Warner, Norcross & Judd* (by *John D. Tully* and *Ernest M. Sharpe),* for plaintiff.

*Varnum, Riddering, Wierengo & Christenson* (by *Clifford C. Christenson, John F. DeWitt,* and *J. Terry Moran),* for defendant.

Before: R. B. BURNS, P. J., and DANHOF and O'HARA,\* JJ.

DANHOF, J. Plaintiff brought this action alleging that defendant, Grand Rapids Real Estate Board, hereinafter the Board, through the operation and maintenance of its multiple listing service, hereinafter the Service, unreasonably restrained trade in violation of the common law and MCLA 445.701; MSA 28.31. Plaintiff also alleged that defendant monopolized the real estate profession in derogation of the common law and MCLA 445.762 *et seq.;* MSA 28.62 *et seq.* Plaintiff prayed that the continued operation of the Service in its then current form be enjoined and that the Board be ordered to permit all brokers licensed by the state to participate in the Service. Trial was had before the Honorable Stuart Hoffius who found that neither monopoly nor unlawful restraint of trade had been proved and thus denied the requested relief. Plaintiff appeals. We affirm.

---

\* Former Supreme Court Justice, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

The Service is a system whereby residential listings of all the Board's members are exposed by the listing broker to all other members. Except where the owner does not desire his property listed through the Service, members obtain listings on listing agreement forms and transmit a copy of the listing agreement to the Board within 48 hours after it is signed. The Board then reproduces the pertinent information from the listing agreement, including all data about the property and a photograph, and delivers this information to all of its members. When a sale of a listed property is concluded by any member-broker other than the listing broker, a service fee is deducted from the sales commission and paid to the Board. The remaining sales commission is then divided between the selling broker and the listing broker.

The Board was established in 1893 and incorporated as a Michigan nonprofit corporation in 1945. The Board's purposes, stated in its original charter and reiterated in its articles of incorporation, are to provide a medium for the collection and dissemination of information about real estate transactions for the benefit of its members and the public at large, to promulgate and enforce rules of ethics and fair trade practices, and to establish a multiple listing service.

As a minimum requirement, an applicant for junior-broker membership in the Board must be duly licensed as a broker by the State of Michigan. The Board also requires an applicant to either have been affiliated as a full-time salesman with a broker member for a continuous period of not less than two years; or the applicant must have been a full-time broker licensed by the state for at least two years immediately preceding his application; or the applicant must have been an active full-

time broker member of some other member of the National Association of Real Estate Boards (NAREB) for two years immediately preceding the filing of his application.

The Board further requires that an applicant must not only have devoted full time to the real estate business, but that his primary income must have been derived from such business. A broker applicant when applying for membership must agree to engage in the real estate business full time. The Board also requires the applicant to establish or associate with an office, open during regular business hours, which meets various physical requirements such as separation from living quarters or other commercial offices, and maintenance of a private closing office which is equipped with a private telephone line and identified by a sign.

The Board requires an applicant to pass a written examination. In addition, the applicant must have satisfactorily completed the Board's education course in real estate or, in lieu thereof, not less than two courses in real estate offered by the University of Michigan or an equivalent institution. An applicant must have conducted himself in such a manner as not to have violated the Board's code of ethics, and he must have established a favorable reputation for professional conduct. To that end, he must secure the endorsement of at least three broker-members of the Board.

A $500 entry fee must accompany the junior-broker application. Applicants are investigated by a membership committee. Election to membership is by an affirmative vote of a majority of all of the Board's directors. Membership is individual and nontransferable.

During the 12-year period preceding the trial of

this case, 1957 through 1969, only 14 applicants for broker membership in the Board were rejected. Of these 14 rejections, 5 were admitted on subsequent applications. Therefore, only 9 persons were refused membership in the Board during that 12-year period, and at least 98 persons were accepted for membership.

The Board's bylaws contain further provisions governing the junior-broker's 2-year probationary period, elevation after that period to senior-broker status, arbitration of disputes with members and nonmembers, hearings on complaints of unethical conduct, provisions for representation by counsel and sworn testimony, expulsion from membership, appeal and review.

In October of 1967, plaintiff obtained a broker's license from the state and made application to become a member of the Board. His application was processed and reviewed according to the procedures outlined above and was denied. For purposes of this opinion, it is important to note that plaintiff has never objected to the Board's rejection of his application. He does not claim that the Board's action was arbitrary and capricious. Neither does he attack the Board's membership requirements. In the two years intervening between his rejection and February, 1969, plaintiff never asked for the reasons behind his rejection. Plaintiff's contention below and here on appeal is that even though he is not a member of the Board, he should be allowed to participate in the Service. He argues that, if any greater requirements than a state license are imposed upon a broker to participate in the Service, then the Service violates the state antitrust laws.

The trial court's opinion reviewing the evidence and applicable law reads in part as follows:

"Plaintiff, Ralph E. Barrows, has been licensed as a real estate salesman by the State of Michigan since 1964. From 1964 to 1967 he was associated with a number of real estate offices which were members of defendant Board. * * * He testified that during the years that he was associated with members of defendant Board, he had between 3,000 and 4,000 listings to work from. At the time of trial he had only five listings with his office.

"He testified in detail concerning his efforts to sell premises which were listed with defendant Board since he has been in his own business and a nonmember of the Board.

"He testified in detail concerning problems he had in working out a sale of a property listed with Vredegoogd Realty Company, a member of defendant Board, even though his offer was for the price asked on the multiple listing service.

"He related that on another occasion in May, 1969, he had had good cooperation from Westdale Realty Company on the sale of a property listed under the multiple listing service. He related that he had had good cooperation from three members of defendant Board in selling real estate and felt that there were substantial economic advantages to be gained from membership on the Board. * * *

"Other real estate brokers who were not members of defendant Board testified relative to their transactions with Board members and working out individual sales of properties listed with defendant Board. Each testified that with certain members of defendant Board they had received less than full cooperation, but in other instances had worked out a satisfactory division of commissions. They also testified that membership in the Board and particularly the use of the multiple listing service would be a substantial advantage in their business.

"* * * It [the Board] maintained the following services for its members and to assist the public:

"1. Multiple Listing Service.

"2. Computer service for its members.

"3. Educational service.

"4. Seminars for its members.

"5. Meetings to discuss mutual problems.

*   *   *

"Two of the present members of the Board testified concerning their successful operation as salesmen and brokers with offices not affiliated with defendant Board prior to their joining the Board. The real estate broker with the largest office in Grand Rapids, Leonard L. Westdale, testified concerning his arrangement for splitting of commissions with nonmembers of defendant Board.

"Professor Carl G. Pearson, Professor of Business at the University of Michigan, testified that a real estate board such as defendant served the public by demonstrating the integrity and ability of its members and described in detail the function of a multiple listing system. The advantages of such system were stated as follows:

"1. Shows the listed property to more individuals.

"2. Better competition among buyers and sellers.

"3. Meets and enforces integrity standards.

"4. An accumulation of much data relative to sales, rental, and exchanges of real estate, and tax matters.

"It was his opinion that a multiple listing system could not operate alone without its affiliation with a real estate board. Advantages of such system were the trust and confidence in the members of the association. He felt that the state licensing provisions were inadequate to properly enforce the strict rules upon real estate brokers and salesmen. He had studied 100 multiple listing systems in New Jersey, and ten in Michigan. He concluded that a multiple listing system could not be set up without a real estate board, although there could be a real estate board without a multiple listing system.

"At the time of the institution of this suit, the bylaws established a fixed sales commission for all members and prohibited cooperation or split of commissions with nonmembers. At the time of trial, the bylaws had been amended so that the sales commissions and division thereof were not fixed by the Board, and the provisions for nonmembers were deleted.

\* \* \*

"MCLA 445.701; MSA 28.31 provides:

" 'That a trust is a combination of capital, skill or arts by 2 or more persons, firms, partnerships, corporations or associations of persons, or of any 2 or more of them, for either, any or all of the following purposes:

" '1. To create or carry out restrictions in trade or commerce; \* \* \*

" '5. \* \* \* Every such trust as is defined herein is declared to be unlawful, against public policy and void.'

"MCLA 445.762; MSA 28.62 provides:

" 'All combinations of persons, copartnerships, or corporations made and entered into for the purpose and with the intent of establishing and maintaining \* \* \* a monopoly of any trade, pursuit, avocation, profession or business, are hereby declared to be against public policy and illegal and void.'

"MCLA 445.763; MSA 28.63 provides:

" 'Any corporation organized under the laws of this state for the purpose of establishing and maintaining, or attempting to establish or maintain, any combination of persons, copartnerships or corporations with intent to establish and maintain or of attempting to establish and maintain a monopoly of any trade, pursuit, avocation, profession or business, is hereby declared to be against public policy and illegal and void.'

"The Michigan Act is patterned after the Sherman Act adopted in 1890. Although Michigan courts are not required to follow the interpretations of the Sherman Act by the Federal Courts, it is in the Federal law where we find most discussion relative to the restraint of trade provisions.

"It has been said that any agreement relative to trade is a restraint of trade. In the early interpretations of the statute this was accepted.

"In *Board of Trade of Chicago v United States,* 246 US 231, 238; 38 S Ct 242, 244; 62 L Ed 683, 687 (1917), it was said as follows:

" 'But the legality of an agreement or regulation cannot be determined by so simple a test, as whether it restrains competition. Every agreement concerning

trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.'

"It was in *Standard Oil Company of New Jersey v United States,* 221 US 1; 31 S Ct 502; 55 L Ed 619 (1910), where the Supreme Court first adopted the 'Rule of reason.'

"In *United States v American Tobacco Co,* 221 US 106; 31 S Ct 632; 55 L Ed 633 (1910), the Court recognized that the statute did not restrict or forbid the making of normal and usual contracts to further trade by agreement and interpreted the *Standard Oil* case. The Court said as follows:

" 'Applying the rule of reason to the construction of the statute, it was held in the *Standard Oil Case* that, as the words "restraint of trade" at common law and in the law of this country at the time of the adoption of the antitrust act only embraced acts or contracts or agreements or combinations which operated to the prejudice of the public interests by unduly restricting competition, or unduly obstructing the due course of trade, or which, either because of their inherent nature or effect, or because of the evident purpose of the acts, etc., injuriously restrained trade, that the words as used in the statute were designed to have and did have but a like significance. It was therefore pointed out that the statute did not forbid or restrain the power to make normal and usual contracts to further trade by resorting to all normal methods, whether by agreement or

otherwise, to accomplish such purpose. In other words, it was held not that acts which the statute prohibited could be removed from the control of its prohibitions by a finding that they were reasonable, but that the duty to interpret, which inevitably arose from the general character of the term "restraint of trade," required that the words "restraint of trade" should be given a meaning which would not destroy the individual right to contract, and render difficult, if not impossible, any movement of trade in the channels of interstate commerce,—the free movement of which it was the purpose of the statute to protect.' 221 US 179–180; 31 S Ct 648; 55 L Ed 693–694.

"It has long been held that trade associations for the improvement, education, integrity, and character of its members are legal and encouraged in the interests of promoting good business. Real Estate Boards have been created to carry out these purposes and according to Professor Pearson have developed multiple listing systems so that all members could freely exchange information relative to listed properties, to discipline their members, and to improve by training, education, and standards, the work of its members.

"The instant suit as filed by the plaintiff does not attack the rules, regulations or bylaws of defendant Board relative to the acceptance of members. Neither does plaintiff seek to have a review of the rejection of his application for membership. This suit seeks only to compel the Board to make the multiple listing service available to the plaintiff and other nonmembers. * * * In doing this, he [plaintiff] relies upon the case of *Grillo v Board of Realtors of Plainfield Area,* 91 NJ Super 202; 219 A2d 635 (1966).

"In that case, plaintiff was a real estate broker licensed in the State of New Jersey who had applied to the defendant real estate board for membership and had been rejected by the board on several occasions. The bylaws of that association required the payment of an initiation fee of $1,000.00, and other standards were fixed for membership. Plaintiff claimed that defendant Board was an unlawful combination in restraint of trade, and that the multiple listing system was contrary to public policy and therefore invalid. The plaintiff

contended that because a nonmember broker was not able to utilize the service of the multiple listing system, he could not compete successfully with board-member brokers. The Court at [217; 219 A2d at] page 644 said as follows:

" 'The Board and its members are acting in combination. That combination is a restraint of trade. As Mr. Justice Brandeis observed in *Board of Trade of City of Chicago v United States,* 246 US 231, 238; 38 S Ct 242, 244; 62 L Ed 683, [687] (1918), "Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence." But not every combination in restraint of trade is illegal. * * * It is the unreasonable combination in restraint of trade that is unlawful.'

"The Court concluded at [222; 219 A2d at] page 646, as follows:

" 'The nonmember broker will not be able to serve effectively the prospective buyers who do come to him. He is precluded from offering for sale a high percentage of the properties which are for sale in the Board's area. Many of the properties for sale will be unknown to the nonmember broker—although the Board member has easy access to this same information. If the nonmember broker does learn of a property which has been multiple listed, and finds a buyer for it, he will not be able to make the sale.'

"The Court concluded therefore that the Board and its members were engaged in an unlawful and illegal restraint upon trade in violation of the common law. The Court found that the $1,000.00 initiation fee was 'itself a restriction upon membership.'

"In the instant case, there was testimony that the $500.00 fee was reasonable and covered the cost of the following:

"1. Training and educational meetings.

"2. Examination of applicant.

"3. Published real estate materials.

"4. All of the existing listings at the time of acceptance. (Approximately 4,000.)

"5. Investigation of applicant.

"6. Investigation of applicant's office.

"7. Investigation for NAREB, and counseling of members.

"In *Grillo, supra,* it appears there was no testimony as in the instant case that nonmember brokers were able to successfully compete with members of the defendant Board. There is no indication in the opinion of the extent of a member broker's business in the area. In the instant case there is evidence of substantial ability to compete, and evidence that a majority of the sales of real estate (in the area covered by the Board) are made without the assistance of members of defendant Board or are sales of properties not listed under the multiple listing system.

"There have been relatively few cases in Michigan dealing with the problems of restraint of trade. In the early case of *Hubbard v Miller,* 27 Mich 15 (1873), the Court had occasion to examine an agreement not to compete and determined that such agreements were not 'prima facie void.'

"The Court in *Hubbard v Miller* said as follows, at page 18:

" 'It has sometimes been said by text writers, and even by courts, that all contracts in restraint of trade, whether general or limited, are prima facie void, or that they are to be presumed void, until it be shown, not only that there was an adequate consideration, but that the circumstances under which the contract was made were such as to render the restraint reasonable.'

"The Court then determined there were certain tests which must be applied, and that one must look at the entire situation to determine whether the restraint will be held valid or invalid. The Court in *Hubbard* said at page 19, as follows:

" 'But if, considered with reference to the situation, business and objects of the parties, and in the light of all the surrounding circumstances with reference to which the contract was made, the restraint contracted for appears to have been for a just and honest purpose, for the protection of the legitimate interests of the party in whose favor it is imposed, reasonable as between them and not specially injurious to the public, the restraint will be held valid.'

"It is therefore apparent that Michigan adopted the rule of reason even before the Federal Court's decision in the *Standard Oil* case in 1910.

"It was in *People, ex rel Attorney General, v Detroit Asphalt Paving Co,* 244 Mich 119; 221 NW 122 (1928), that the Court recognized that Michigan had early adopted this rule. The Court stated that it found no monopoly or restraint of trade in the case wherein defendant did all of the asphalt paving in the City of Detroit. The Court recognized that Michigan had adopted the rule of reason before the *Standard Oil* case and concluded:

" 'If, then, the rule of reason is to be applied, as it should be, it becomes quite apparent that the state has failed to make a case of unreasonable restraint of trade.' 244 Mich 127; 221 NW 124.

"The Court finally found no monopoly existed, and that there was not an unreasonable restraint of trade.

"The Court in *Staebler-Kempf Oil Co v Mac's Auto Mart, Inc,* 329 Mich 351; 45 NW2d 316 (1951), enforced an agreement whereby defendant agreed to sell gasoline at the same price as other retailers. The Court said:

" 'It is urged that the contract is an attempt to stifle competition among the retailers supplied by the plaintiff, and is a horizontal price-fixing agreement to protect the plaintiff in the operation of its own retail outlet, and that these are unlawful purposes under the statute.

" 'The statute, if read literally, would seem to support the defendant's contentions. However, the statute does not define restraint of trade, and the definition has been judicially supplied. It has long been held that a contract would not be construed as in restraint of trade unless the restraint was unreasonable.' 329 Mich 356; 45 NW2d 318.

"In *Hunt v Riverside Cooperative Club,* 140 Mich 538; 104 NW 40 (1905), the Court found an unlawful combination of wholesale dealers in plumbing supplies agreed to sell to only master plumbers at certain fixed prices. The agreement further provided a standard figure for the merchandise sold. The Court found that these agreements were formed for the purpose of abolishing competition and therefore violated the statute. In the

instant case there is no such agreement. Even before the modification of the bylaws, members of defendant Board were cooperating with nonmembers in the division of commissions. Even plaintiff had had satisfactory relations with certain brokers.

"In *Albert v Gogebic County Hospital,* 341 Mich 344; 67 NW2d 244 (1954), the Court found that regulations adopted by defendant county hospital which prevented certain doctors from practicing in that hospital were illegal and void. The Court's opinion partially relies upon the fact that it is a county hospital but further upon the fact that the plaintiff was admitted to practice medicine in the state and that his patients had the right to insist upon his care in the hospital rather than to be turned over to another treating physician. The Court also relied upon the fact that the county hospital act[1] did not grant to the hospital board the power to suspend the right of any person to practice medicine who was licensed in this state. In the instant case it is to be noted that defendant Board does not in any way restrict the plaintiff's ability to sell real estate in this community, and even permits him to sell properties on the multiple listing system.

"In more recent cases concerning restraint of trade, the Court has considered the statutes of Michigan. The Court has denied the efforts of Michigan National Bank to acquire stock of an existing competing bank in Port Huron which would leave the Michigan National Bank as the only bank in the area. The Court in interpreting the statute in *Peoples Savings Bank v Stoddard,* 359 Mich 297, 329–330; 102 NW2d 777, 793 (1960), said after quoting MSA 28.31 and MSA 28.62:

" 'Monopoly may be said to be the result of the practical elimination of effective business competition which thereby creates a power to control prices to the harm of the public.

\* \* \*

" 'Similarly, an agreement or scheme, the manifest object of which is to acquire control over a competitor through its capital stock for the purpose of extinguish-

[1] MCLA 331.151 *et seq.;* MSA 14.1131 *et seq.*

ing competition, is per se in violation of the antimono-
poly laws.'

"In *Attorney General, ex rel State Banking Commis-
sioner, v Michigan National Bank,* 377 Mich 481; 141
NW2d 73 (1966), the Court permitted the defendant
bank to acquire two existing banks in Grand Ledge
which resulted in acquiring over 90% of the banking
business in that area. The Court recognized that not
every combination is illegal, and set forth the test:

" 'In examining any combination, the overriding test,
of course, is protection of the public interest. "But not
every joinder of competing businesses or acquisition of
instrumentalities that have been used in competition is
an undue restraint of trade or a creation of a monopoly.
Each situation must be measured by the rule of reason.
And a fundamental test is injury to the public." ' 377
Mich 492; 141 NW2d 77.

"Then the Court concluded:

" 'Although the sale and liquidation will result in
Michigan National Bank acquiring over 90% of the
banking business of the Grand Ledge area, we believe
no violation of the state's antimonopoly laws was estab-
lished, since the transaction was founded not only on
economic necessity and the need in the Grand Ledge
community for modern banking facilities, but was the
result of open, competitive bidding.' 377 Mich 493; 141
NW2d 78.

"Applying these tests and the rule of reason to the
instant case, it is apparent that the multiple listing
system has become an integral part of the defendant
Board's activities and depends upon the Board's rules
and regulations and ability to discipline its members to
be a successful operation. It tends to protect the public,
encourages the education and training of realtors, disci-
plines its members for violation of codes of ethics which
are substantially higher than those required by the
state for licensing of brokers and salesmen.

"The testimony further showed that nonmember bro-
kers are able to successfully compete with members of
defendant Board; that the multiple listing system
makes substantially less than 50% of the real estate

sales in the area, and that a substantial number of realtors are not members of defendant Board.

"An important case decided by the Supreme Court of the United States is relevant to the issue here raised. In *Associated Press v United States,* 326 US 1; 65 S Ct 1416; 89 L Ed 2013 (1944), the United States sought an injunction against the Associated Press which then had more than 1,200 newspapers as members of its association for the purpose of disseminating news in the United States. All members were bound by bylaws which imposed certain restrictions upon them and permitted them to be fined or suspended or expelled in the absolute discretion of other members of the association. This action was final and there was no right of appeal. There was also a restriction which prohibited any member making available to a nonmember news furnished to it by the Associated Press. The Court in a lengthy opinion found that the requirements of membership were in restraint of trade. It refused to accept as members other newspapers in a community which was already served by a newspaper member of Associated Press.

"The Court also found that the provision relative to prohibiting the dissemination of news to nonmembers was not illegal 'standing by itself' but was illegal only because of the restrictions upon membership and the bylaws relative to discipline of members. In the instant case there is no evidence (nor does plaintiff claim it) relative to any improper restriction upon membership in the association.

"Justice Roberts in his dissenting opinion analyzed the possible ways of violating the restrictions on trade, as follows:

" 'If AP's activities fall within the denunciation of the statute it must be because the members (1) have combined with the purpose to restrain trade by destroying competition or (2), even though their intent was innocent, have set up a combination which either (a) tends unreasonably to restrain, or (b) has in fact resulted, in undue and unreasonable restraint of free competition in trade or commerce; or (3) intended and attempted to monopolize a part or all of a branch of trade; or (4) have created an organization of such proportions that

in fact it has such a monopoly; or (5) have created an agency which the Sherman Act renders a public utility subject to regulation notwithstanding the guarantees of the First Amendment of the Constitution.' 326 US 32–33; 65 S Ct 1430; 89 L Ed 2037.

"In summary, this court is of the opinion based upon the tests set forth in Justice Roberts' opinion, as follows:

"(1) Defendant has not combined with a purpose to restrain trade by destroying competition.

"(2) Defendant has not set up a combination which tends unreasonably to restrain or which has in fact resulted in undue and unreasonable restraint of free competition.

"(3) Defendant has not attempted to monopolize a part or all of the realty business.

"(4) Defendant has not been shown to be a monopoly.

"(5) And, defendant certainly is not a utility.

"The testimony at the trial convinces this court that even before the deletion of the bylaw prohibiting members of defendant Board from sharing commissions or permitting nonmembers to sell properties on the multiple listing system that there was cooperation between nonmembers and members in the selling of listed properties. With the deletion of that provision in the bylaws, this court is of the opinion that it is similar to the *Associated Press* case, *supra,* wherein it was found that the provision about prohibiting members from disseminating news to nonmembers was not invalid 'standing by itself.' The *Associated Press* case clearly relied upon the failure to permit certain persons who were competing with members to join the Associated Press service.

"All brokers meeting the qualifications of defendant Board may become members, and the number of rejections in the period from 1958 to the date of hearing is minimal.

"In conclusion, this court is convinced that upon the proofs submitted, defendant's multiple-listing service does not violate the common law or the Michigan statutes relating to monopolies and restraint of trade for the following reasons:

"(1) The multiple-listing service is an integral part of defendant Board's membership and service.

"(2) There is evidence of substantial competition between Board members utilizing the multiple-listing service.

"(3) There is evidence of substantial competition between Board members and non-Board members in order to obtain listings and in the sale of properties already listed.

. "(4) There is no evidence or claim made of any discrimination on applications for membership to defendant Board (in *Grillo* the Court stated there was even some evidence of racial discrimination. In *Associated Press* there was evidence of rejection of an applicant solely because the applicant came from the same community where AP service was already furnished).

"(5) multiple-listing service in and of itself does not constitute a restraint of trade tending to become a monopoly.

"This court is, therefore, of the conclusion that the plaintiff is not entitled to the relief claimed, and a judgment in accordance with this opinion may be submitted."

We concur in the well-reasoned opinion of the trial court. In today's highly mobile society, the Service, essentially an exchange in residential listings, results in a significant public benefit by giving greater exposure to sellers' properties and providing buyers with a greater inventory. As a consequence, prices of residential real estate reflect more accurately the economic forces of the market place. Competition among brokers is promoted: the sole practitioner who comports himself according to the Board's ethical and professional standards has all of the listing advantages of the largest firms. The Board's membership requirements assure the public that negotiations will be carried out in an ethical manner. The requirements of experience and a full-time commitment

to the real estate business are reasonably designed to assure that new members will be professionally competent and will generate their share of listings. In *Anderson v United States,* 171 US 604; 19 S Ct 50; 43 L Ed 300 (1898), an association of livestock dealers governed and controlled a trader's livestock exchange. The association's bylaws contained provisions discriminating against nonmembers. Still the Court found that neither attempt to monopolize nor unlawful restraint of trade had been proved:

"From very early times it has been the custom for men engaged in the occupation of buying and selling articles of a similar nature at any particular place to associate themselves together. The object of the association has in many cases been to provide for the ready transaction of the business of the associates by obtaining a general headquarters for its conduct, and thus to insure a quick and certain market for the sale or purchase of the article dealt in. Another purpose has been to provide a standard of business integrity among the members by adopting rules for just and fair dealing among them and enforcing the same by penalties for their violation. The agreements have been voluntary, and the penalties have been enforced under the supervision and by members of the association. The preamble adopted by the association in this case shows the ostensible purpose of its formation. It was not formed for pecuniary profits, and a careful perusal of the whole agreement fails, as we think, to show that its purpose was other than as stated in the preamble. In other words, we think that the rules adopted do not contradict the expressed purpose of the preamble, and that the result naturally to be expected from an enforcement of the rules would not directly, if at all, affect interstate trade or commerce." 171 US 616–617; 19 S Ct 54; 43 L Ed 306.

We do not agree with plaintiff that the trial

court erred in applying the rule of reason to the facts of this case. Plaintiff contends that the trial court should have applied the rule of per se illegality. However, the per se rule is only applicable to those cases which exhibit severe restraints of trade with little or no public benefit. Examples of per se violations of Federal anti-trust laws are price fixing, *United States v Socony-Vacuum Oil Co,* 310 US 150; 60 S Ct 811; 84 L Ed 1129 (1940), and concerted refusal to deal, *Fashion Originators' Guild of America v Federal Trade Commission,* 312 US 457; 61 S Ct 703; 85 L Ed 949 (1941). In those cases, anti-competitive effects were conclusively presumed to flow from the actions complained of.

Plaintiff alleges that the Service is per se unlawful because it is a subterfuge for price-fixing. This claim arises from the fact that at the time the suit was instituted, the bylaws of the Board contained a minimum commission rate for members.[2] Assuming *arguendo* that price-fixing existed as of the filing of plaintiff's complaint,[3] plaintiff makes no claim that he has been injured by the practice, and his allegations of price-fixing have absolutely nothing to do with the relief he has requested. Indeed, if plaintiff is not bound by the Board's bylaws, his ability to undercut member-commission rates alleged to be fixed would give him a competitive advantage. As was said in *Sunbeam Corp v Payless Drug Stores,* 113 F Supp 31, 42 (ND Cal, 1953), plaintiff must allege and prove special injury:

---

[2] The provisions dealing with minimum commission rates were deleted from the bylaws subsequent to the filing of the complaint and approximately one year prior to trial. A new provision was adopted authorizing the Board of Directors to promulgate suggested minimum fees and commission rates. Subsequent to trial, the suggested minimum fee and commission schedule was deleted.

[3] *See Goldfarb v Virginia State Bar,* 355 F Supp 491 (ED Va, 1973).

"To establish a cause for relief by reason of a viola-. tion of the antitrust laws of the United States by defendant, an individual plaintiff must allege that such violation was the proximate cause of special injury to his business or property, as distinguished from injury to other persons or to the public. (Citations omitted.) It is not enough to allege something forbidden by the antitrust laws and to claim general damage resulting therefrom, (citation omitted) but the complaint asserting a statutory cause of action must affirmatively show the nature and character of the injury suffered, and that it was an injury to the plaintiff's business or property within the meaning of the statute."

Plaintiff also claims that the Service is per se unlawful because it is a subterfuge for concerted refusal to deal. *Klor's, Inc v Broadway-Hale Stores, Inc,* 359 US 207; 79 S Ct 705; 3 L Ed 2d 741 (1959). But *Klor's* as well as other cases applying the per se rule in this area were characterized by purposefully predatory and coercive conduct designed to injure competitors. *Fashion Originators' Guild, supra.* In contrast to the scheme in *Klor's,* the facts of this case contain absolutely no evidence of any purpose or intent to injure nonmember competitors.

Lastly, plaintiff argues that the trial court abused its discretion by excluding proffered rebuttal testimony as to the successful separate operation of multiple-listing services in New Jersey. The trial court's ruling is as follows:

"In the offer of the testimony of an individual from the Plainfield, New Jersey area in rebuttal of a general opinion by Professor Pearson raises a question as to the extent that one can go on rebuttal testimony. I have therefore asked the reporter to check and have not yet had her verification but it is apparently agreed that the posed hypothetical question given to Professor Pearson, was would a multiple listing system be able to operate independent of the real estate board and was limited to

the State of Michigan in the hypothetical. I realize on cross-examination he was asked and was talking generally about the situation, but I am afraid that if we permitted the offer of testimony to be received that we would come into the position where it would have to be that we would have to investigate what the laws of New Jersey were relative to their general brokerage and real estate licensing provisions which could or could not be more strict than the Michigan one, and it seems to me that I would be opening far more than the Court should open on what is generally considered the very limited scope of rebuttal testimony. I am of opinion that we would be opening the door for the investigation of all of possibly the New Jersey operations or laws relative to the operations of the real estate boards and the real estate business and I therefore will decline the offer made and rule that it would be inadmissible and feel that we could not take testimony of that nature."

The rule of rebuttal evidence is stated in *People v Utter,* 217 Mich 74, 83; 185 NW 830, 833–834 (1921):

"Rebuttal evidence is broadly defined as that given by one party to contradict, repel, explain or disprove evidence produced by the other party and tending directly to weaken·or impeach the same. In practical application the line of demarcation between rebuttal evidence and that which should properly be given in chief before the prosecution rests is frequently more or less obscure, and it is a general rule that whether evidence which could have been offered before resting may be given in rebuttal is a matter within the discretion of the trial court."

See also *Litle v Grieve,* 25 Mich App 107; 181 NW2d 5 (1970); *Gonzalez v Hoffman,* 9 Mich App 522; 157 NW2d 475 (1968).

In the case at bar, plaintiff's cross-examination of Dr. Pearson was vigorous and complete. Plaintiff elicited from the witness an admission that the Service could be operated administratively without

being tied to the Board. Thus, plaintiff put on the record substantially all that he hoped to show through rebuttal testimony. Admission of rebuttal testimony as to the operation of multiple listing services in New Jersey might have entailed surre-buttal evidence as to the operation of such systems in the remaining 48 states. We hold that plaintiff has failed to demonstrate a clear abuse of discretion mandating reversal.

Affirmed. Costs to defendant.

All concurred.