OLEKSY v SISTERS OF MERCY OF LANSING, MICHIGAN

Docket No. 44455. Submitted August 29, 1979, at Lansing.—Decided October 2, 1979. Leave to appeal applied for.

Stanley P. Oleksy, M.D., and several others brought an action in quo warranto against Sisters of Mercy of Lansing, Michigan and W. A. Foote Memorial Hospital, Inc., seeking to set aside the sale of Mercy Hospital in Jackson by the Sisters of Mercy to W. A. Foote Memorial Hospital. The Jackson Circuit Court, Richard Robinson, J., entered a pre-trial order limiting the issues at trial to whether the defendants exceeded their corporate powers and whether the defendants violated the antitrust laws. Trial was held on these issues and a judgment was entered for the defendants. The plaintiffs appeal, and the defendants cross-appeal raising various issues challenging the plaintiffs' ability to maintain the action. *Held:*

1. Plaintiff Oleksy did not lose his standing to participate in the action by virtue of his removing his residence from the state after the action was commenced.

2. In the pleadings of a previous action between these parties it was alleged that the Sisters of Mercy held the property as a charitable trust. That action was concluded by a summary judgment for the defendants. For purposes of the summary judgment the plaintiffs' allegations were necessarily accepted as true, but the summary judgment was not res judicata as to the issue because the issue was not decided as a substantive matter.

3. The Sisters of Mercy did not abuse their corporate authority or engage in ultra vires conduct in selling the hospital. No

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 62 Am Jur 2d, Pretrial Conference § 34.

[2] 59 Am Jur 2d, Parties §§ 26-29.

[3] 73 Am Jur 2d, Summary Judgment §§ 35, 36.

[4] 19 Am Jur 2d, Corporations §§ 963, 995.

[5] 54 Am Jur 2d, Monopolies, Restraints of Trade, and Unfair Trade Practices §§ 618, 648-650.
 59 Am Jur 2d, Parties § 30.

[6] 54 Am Jur 2d, Monopolies, Restraints of Trade, and Unfair Trade Practices §§ 451-453.

restrictions on the ownership, acquisition or conveyancing of property were placed in the articles of incorporation of the Sisters of Mercy or any of the previous successive owners of the hospital, nor are any such restrictions contained in the corporation laws of the state.

4. The plaintiffs have standing to assert a violation of the state's antitrust laws by virtue of a court rule which allows private citizens to act to prosecute antitrust actions where the Attorney General, who has statutory authority to bring such an action, has refused to do so.

5. The sale of Mercy Hospital did not violate the antitrust laws of Michigan. The sale was not made with the purpose of restricting trade or commerce, the record does not indicate that the sale created a monopoly in hospital care in Jackson County, the business is a highly regulated one, and the evidence does not indicate that the quality of care changed after the sale or that the price of care is significantly different than elsewhere.

Affirmed, and the cross-appeal is dismissed.

1. TRIAL — PRETRIAL ORDERS — COURSE OF LITIGATION.

A pretrial order which limits the issues to be presented at trial controls the subsequent course of the litigation.

2. PARTIES — STANDING — RESIDENCY.

A party who commences an action in Michigan while then a resident of Michigan does not lose his standing by subsequently removing his residence from the state.

3. MOTIONS — SUMMARY JUDGMENT — ALLEGATIONS — RES JUDICATA.

A plaintiff's allegations must be accepted as true when ruling upon a defendant's motion for summary judgment; such a ruling does not decide as a substantive matter that those allegations are in fact true nor is the ruling res judicata as to those matters.

4. CORPORATIONS — ULTRA VIRES — SALE OF REAL PROPERTY.

The sale of a hospital by the corporate owner of the hospital was not an ultra vires action where neither Michigan's corporation law nor the articles of incorporation of any of the successive owners of the hospital place any restrictions on the ownership, acquisition or conveyancing of any of the corporation's real or personal assets.

5. QUO WARRANTO — CORPORATIONS — PARTIES — COURT RULES.

An action in quo warranto asserting a violation by a corporation of the state's antitrust laws may be brought by private citizens

to enforce a public interest where the Attorney General has refused to bring such an action (GCR 1963, 715.2).

6. MONOPOLIES — ANTITRUST LAWS — DETRIMENT TO PUBLIC — FAC-
   TORS CONSIDERED.

    The fundamental test of whether or not a monopoly violates the antitrust law is whether there is a detriment to the public; a contract of sale which allegedly creates a restraint of trade should be considered by taking into account such factors as the circumstances surrounding the contract, the relationship of the parties and their relationship to the subject matter dealt with, the subject matter's relation to the general public, the facts peculiar to the business, its condition before and after the restraint was imposed, and the purpose or end sought to be attained.

*Alvin G. Dahlem* and *Phillip H. Berkemeier,* for plaintiffs.

*Dykema, Gossett, Spencer, Goodnow & Trigg* (by *John H. Schomer, Jack C. Radcliffe, Jr.,* and *James B. Falahee, Jr.),* for W. A. Foote Memorial Hospital, Inc.

*Colombo & Colombo* (by *Louis J. Colombo, Jr.,* and *Lawrence F. Raniszeski),* for Sisters of Mercy of Lansing, Michigan.

Before: J. H. GILLIS, P.J., and R. B. BURNS and N. J. KAUFMAN, JJ.

PER CURIAM. The plaintiffs in this cause appeal from an order of the Jackson County Circuit Court denying their action in quo warranto seeking to set aside the sale of Mercy Hospital in Jackson, Michigan, by defendant Sisters of Mercy of Lansing, Michigan, to defendant W. A. Foote Memorial Hospital.

After a pretrial conference, the trial court entered a pretrial order limiting the issues to be presented at trial to: whether defendants have

exceeded their corporate powers; and, whether defendants have violated the anti-trust laws. It is fundamental that this pre-trial order controls the subsequent course of the litigation. See GCR 1963, 301.3 and *Bednarsh v Winshall,* 374 Mich 667; 133 NW2d 202 (1965).

After an extensive trial upon these questions, the trial court set forth its conclusions in a well-written, well-reasoned opinion. We recognize the trial court's unique position, allowing it to survey the briefs and facts presented first-hand, and observe the witnesses appearing before it. Moreover, we find ourselves in complete accord with the trial court's conclusions. Therefore, as we do not feel that we can improve upon the trial court's opinion, we adopt it as our own and set it forth in full herein. Our adoption of this opinion necessarily renders moot the various procedural challenges to plaintiffs' maintenance of this action that defendants have raised in their cross-appeal, to-wit: questions of standing, estoppel, laches, and res judicata.

As the trial court stated:

"This is an action in the nature of quo warranto seeking to set aside the August 29, 1975, sale of Mercy Hospital in Jackson, Michigan, by defendants, Sisters of Mercy of Lansing, Michigan (hereinafter called 'Mercy'), to defendant, W. A. Foote Memorial Hospital, Inc. (hereinafter called 'Foote'). At that time Foote operated a private non-profit hospital in Jackson and the Sisters of Mercy operated Mercy Hospital also in Jackson. Prior to the sale of Mercy Hospital to Foote, plaintiffs had unsuccessfully attempted to purchase Mercy Hospital. The plaintiff, Committee to Preserve Mercy Hospital, is a non-profit corporation organized for the purpose of taking over ownership and operation of Mercy Hospital.

"In 1975, the Sisters of Mercy entered into an agreement to sell Mercy Hospital to Foote, such agreement

being consummated on August 29, 1975. On July 31, 1975, while negotiations between the Sisters of Mercy and Foote were still pending, the individual plaintiffs filed a complaint against the Sisters of Mercy (Jackson County No. 75-004921-CZ) seeking a preliminary injunction restraining the Sisters of Mercy from conveying Mercy Hospital; an injunction restraining the Sisters of Mercy from using the proceeds from such sale in any community other than Jackson; and an order transferring Mercy Hospital to a then unspecified group. This complaint (hereinafter called 'Oleksy I') alleged that the proposed sale violated a charitable trust created by the contributions of plaintiff and others.

"In response to this complaint, the Sisters of Mercy filed a motion for summary judgment, which was heard by Judge Russell Noble on August 5, 1975, together with a motion to intervene filed by Bruce A. Barton, then prosecuting attorney for Jackson County. On August 11, 1975, Barton filed an amended motion to intervene which attached a proposed complaint of intervener. In addition to adopting all the allegations of the Oleksy I complaint, Barton's complaint set forth the basis for an action in the nature of Quo Warranto. He further alleged that the Sisters of Mercy lacked corporate authority to convey the hospital facilities to Foote.

"On August 15, 1975, Judge Noble dismissed Oleksy I and denied Barton's motion to intervene, holding that the Attorney General was the proper party to maintain the actions since the complaints sought enforce the terms of a charitable trust under MCLA 554.351 et seq.

"Motions for rehearing were filed by the parties and denied and plaintiffs appealed to the Michigan Court of Appeals. Barton took no appeal. However, on August 19, 1975, Barton filed a complaint in the nature of Quo Warranto (Jackson County Circuit Court No. 75-005068-CZ) naming only the Sisters of Mercy as a defendant, this complaint containing essentially the same allegations as were set forth in Oleksy I.

"On September 2, 1975, the Sisters of Mercy filed a motion for summary judgment and thereafter Barton filed an amended complaint in the nature of quo warranto adding Foote as a defendant and further alleging that the sale constituted an abuse and misuse of corpo-

rate authority between Sisters of Mercy and Foote, and further asserting that the sale constituted a violation of the Michigan Anti-trust Statutes.

"Defendants' motion for summary judgment was granted as to all of plaintiffs' allegations and Barton thereupon appealed to the Michigan Court of Appeals. The two appeals then pending before the Court of Appeals were consolidated for purpose of hearing and disposition, and on March 9, 1977, the Court of Appeals issued an opinion affirming the judgments of dismissal (*Oleksy,* et al. v *Sisters of Mercy of Lansing, Michigan,* et al., 74 Mich App 374 [253 NW2d 772 (1977)]). No appeal was taken by either of the plaintiffs or Barton to the Supreme Court.

"Approximately 10 months later plaintiffs requested and this court granted leave to file a complaint in the nature of quo warranto. The defendants filed motions to set aside the order granting leave to file said action of quo warranto and alternatively for accelerated judgment and summary judgment of dismissal, such motions being denied by this court on April 26, 1978. Defendants then filed an application for leave to appeal and designation of appeal as emergency appeal and a motion for immediate consideration thereof with the Court of Appeals. On June 7, 1978, the Court of Appeals [Docket No. 78-1515] denied defendants' application for leave to appeal for failure to persuade the Court for the need for immediate appellate review. The defendants then filed an application for leave to take an emergency appeal to the Michigan Supreme Court, which application was denied [403 Mich 827 (1978)].

"On October 12, 1978, pursuant to a stipulation of the parties, this court entered an order dismissing all allegations of the complaint respecting the existence and representation of a class of persons in the prosecution of this action.

"Other than the two central issues of ultra vires conduct and violation of the anti-trust laws, which will be addressed last, the pleadings and proofs raised several lesser issues which can be disposed of with little discussion:

"I

"Should plaintiff, Stanley P. Oleksy, be dismissed as a party, being no longer a resident of Michigan?

"The answer is no. Defendants have been unable to direct our attention to any authority in support of their claim that one who commences an action in Michigan while then a resident of Michigan, loses his standing by subsequently removing his residence from the state. It is this writer's opinion that the two main issues in this case (ultra vires conduct and anti-trust violations) are not issues which turn on residency.

"II

"Is plaintiffs' claim that the Sisters of Mercy held as trustees of a charitable trust res judicata?

"The answer is no. As pointed out by defendants, their motions for summary judgment, pursuant to GCR 1963, 117.2(1), must accept as true plaintiffs' allegations that Mercy Hospital was held as a charitable trust, and do not constitute an admission by them that such a charitable trust existed. In like manner, the opinion in *Oleksy v Sisters of Mercy,* 74 Mich App 374 (1977), in ruling on defendants' motion for summary judgment, of necessity, had to accept as true plaintiffs' allegation that the hospital held in charitable trust. It did not decide, as a substantive matter, that such was the case.

"III

"The religious issue.

"Defendants have renewed their challenge to the court's jurisdiction over this dispute on grounds that it is a religious dispute under the First and Fourteenth Amendments to the United States Constitution. In determining that this court does have jurisdiction, I find nothing in the trial record which would cause a change in this court's opinion dated April 18, 1978.

"IV

"Did defendants, Sisters of Mercy, abuse their corporate authority or engage in ultra vires conduct in selling Mercy Hospital to Foote?

"The answer is no. Plaintiffs presented ten witnesses (counsel stipulated that an additional twenty witnesses

would have if sworn and questioned, testified to the same effect) who testified that they made contributions to Mercy Hospital during the hospital fund drive held in the mid-1950's. There was evidence that the solicitation of contributions by Mercy stressed Mercy's desire to continue to provide hospital facilities for the Jackson area. Nine of the ten witnesses stated that they would not have contributed had they known that twenty years later Mercy would sell the hospital and take the proceeds out of the Jackson community (although no clear proof was offered on this subject, defendants did not seriously oppose plaintiffs' claim that the sale proceeds were to be used by Mercy elsewhere than in Jackson).

"The foregoing testimony is supportive of plaintiffs' claim that defendants breached the terms of a charitable trust. However, assuming a charitable trust had been created, the issue of whether its terms were violated by defendants was not before the court, since the Michigan Court of Appeals in *Oleksy I* has determined that prosecution of such violations has, by statute, been assigned exclusively to the Attorney General.

"It may well be that had Michigan's Attorney General elected, as did California's Attorney General, to act to prohibit this sale as a violation of the terms of a charitable trust, a Michigan court would have found such violation, based on Mercy's fund solicitations, as did the California court in *Queen of Angels Hospital v Younger,* [66 Cal App 3d 359] 136 Cal Reptr 36 (1977). Our Attorney General did not so elect.

"Michigan's General Corporation Act provides:

" 'Section 125. Any non-profit corporation, the objects of which require the transaction of business * * * the care and custody of property, * * * shall have the right and power to acquire, hold, protect and convey such properties as are naturally or properly within the scope of its Articles * * *' MCLA 450.125 [MSA 21.126].

"Our Business Corporation Act provides:

" 'Section 261. A corporation, subject to any limitation provided in this act, in any other statute of this state or in its Articles of Incorporation, shall have power in furtherance of its corporate purposes to:

(f) purchase, receive, take by grant, gift, devise, be-

quest or otherwise, lease or otherwise acquire, own, hold, improve, employ, use and otherwise deal in and with, real or personal property, or an interest therein, wherever situated;

(g) sell, convey, lease, exchange, transfer or otherwise dispose of * * * any of its property, or an interest therein, wherever situated.' MCLA 450.1261 [MSA 21.200(261)].

"Title to the real estate on which Mercy Hospital is situated was acquired in 1915 by deed (Def Mercy Ex 4) to Sisters of Mercy, Diocese of Detroit, a predecessor to the present defendant, Mercy. This deed contained no restrictions as to the use of the lands or as to reconveyance. The Articles of Association of the grantee (Def Mercy Ex 21b) set forth as the purpose of the corporation 'the diffusing of moral and religious knowledge'.

"In 1937, the Sisters of Mercy, Diocese of Detroit, conveyed the hospital lands by deed (Def Mercy Ex 6) to its successor, Mercy Hospital of the City of Jackson, a non-profit corporation, organized in 1915, whose Articles of Association (Def Mercy Ex 22a) stated its purpose to be:

" 'Article II * * * To conduct a hospital and furnish care and medical attendance to sick and disabled persons'.
This deed (Def Mercy Ex 6) likewise contained no restrictions as to use or as to reconveyance.

"In 1946, Mercy Hospital of the City of Jackson conveyed the hospital lands by deed (Def Mercy Ex 8) to its successor, The Sisters of Mercy, Lansing, Michigan. This deed, like the others, contained no restrictions as to use or as to reconveyance. The Articles of Incorporation of this non-profit corporation (Def Mercy Ex 25) set forth its purpose as:

" 'Article II. To establish, maintain and conduct charitable institutions in the State of Michigan for the care and relief of indigent and other sick, infirm, aged or orphaned persons; * * * to perform corporal * * * works of mercy and to hold, own, manage and control real and personal properties and funds to be used for the * * * purposes aforesaid'.

"In 1976, subsequent to the sale which is the subject

of this lawsuit, The Sisters of Mercy, Lansing, Michigan merged with the following:

The Sisters of Mercy of Hammond, Indiana

The Sisters of Mercy of Grand Rapids

St. Joseph's Mercy Hospital of Dubuque (Iowa)

Sisters of Mercy Health Corporation

St. Joseph's Mercy Hospital of Detroit

to form the present ownership of the hospital lands in question, Sisters of Mercy Health Corporation. The plan of merger (Def Mercy Ex 25) adopted as the purposes of the Health Corporation the purposes of its constituent predecessors.

"The proofs indicate that the original corporation, Sisters of Mercy, Diocese of Detroit, owned and operated various hospitals throughout Michigan, one of which is the hospital owned and operated by defendant, Mercy, in Jackson.

"Neither Michigan's corporation laws nor the Articles of Incorporation of the successive owners of the hospital at Jackson place any restrictions on the ownership, acquisition or conveyancing of real or personal assets. As pointed out by defendant, Mercy, in its brief, the burden rests on the one charging ultra vires conduct to sustain the charge. *American Employers' Insurance Company v H G Christman & Bros Co,* 284 Mich 36, 43 [278 NW 750 (1938)]. This plaintiffs have not done.

"Plaintiffs apparently rely on *Queen of Angels Hospital v Younger, supra,* to support their claim that a violation of the terms of a charitable trust can also be an ultra vires act. This writer does not quarrel with such a contention, but merely points out, as was pointed out by the California court, that the power given to the Angels of Mercy by its Articles of Incorporation 'to establish, own, maintain and operate a hospital in the City of Los Angeles' did not include the power to abandon its hospital in favor of out-patient clinics. No comparable restriction on the instant conveyance is contained in Mercy's Articles of Incorporation.

"V

"DO PLAINTIFFS HAVE STANDING TO ASSERT A VIOLATION OF MICHIGAN'S ANTI-TRUST LAWS?

"The answer is yes. The persons who are entitled to

seek relief under Michigan's anti-trust law are described in two different sections of the law:

"MCLA 445.702 [MSA 28.32] directs the Attorney General or the Prosecuting Attorney to protect the public interest:

" 'For a violation of any of the provisions of this act by any corporation or association mentioned herein, it shall be the duty of the attorney general or the prosecuting attorney of the proper county, to institute proper suits or quo warranto proceedings * * *'

"MCLA 445.711 [MSA 28.38] permits the enforcement of private rights:

" 'In addition to the criminal and civil penalties provided, any person who shall be injured in his business or property by any other person or corporation or association or partnership, by reason of anything forbidden or declared to be unlawful by this act, may sue therefor * * * and to recover two-fold the damages by him sustained * * *'

"Defendants are correct in asserting that plaintiffs have no standing to sue to enforce a private right under the act because they are not engaged in commerce and they have not shown any injury to their business or property. (See MCLA 445.711 above.)

"GCR 1963, 715.2 provides:

" '(1) *Actions by Attorney General.* Actions for quo warranto shall be brought by the Attorney General when the actions are against:

(a) persons specified in sub-rule 715.1(1);

(b) persons who usurp, intrude into, or wrongfully hold or exercise any office in any public corporation created by the authority of this state;

(c) any association, or number of persons, acting as a corporation within this state without being legally incorporated;

(d) a corporation that offends against any of the provisions of the act or acts creating, offering, or renewing the corporation;

(e) a corporation that violates the provisions of any law by which the corporation shall have forfeited its charter by misuser;

(f) a corporation that has forfeited its privileges and franchises by non-user;

(g) a corporation that has done or omitted any acts which amount to a surrender of its corporate rights, privileges and franchises; or has exercised any franchise or privilege not conferred upon it by law.'

"Our Court of Appeals in *Oleksy I, supra,* in holding that the attorney general has authority to prosecute anti-trust actions under the above rule, not only gave the rule precedence over conflicting MCLA 445.702, but found his anti-trust power within subsections (c)-(g) above—areas where, under subsections (3) and (4) of the Rule, private citizens are given power to act if the attorney general refuses to. Plaintiffs are correct when they say that they have stepped into the attorney general's shoes to enforce a public interest.

"VI

"DID THE SALE OF MERCY HOSPITAL TO FOOTE VIOLATE MICHIGAN'S ANTI-TRUST LAW?

"The answer is no. Michigan's Anti-Trust Law, MCLA 445.701 [MSA 28.31] *et seq.* provides:

" '445.701 Sec. 1. That a trust is a combination of capital, skill or arts by 2 or more persons, firms, partnerships, corporations or associations of persons, or of any 2 or more of them, for either, any or all of the following purposes:

1. To carry out restrictions in trade or commerce.

5. * * * Every such trust as is defined herein is declared to be unlawful * * *'

"As stated in *Barrows v Grand Rapids Real Estate Board,* 51 Mich App 75 [214 NW2d 532] (1974):

" 'The Michigan Act is patterned after the Sherman Act adopted in 1890. Although Michigan courts are not required to follow the interpretations of the Sherman Act by the federal courts, it is in the federal law where we find most discussion relative to the restraint of trade provisions'.

"58 CJS 989-90 has this to say about the factors to be considered in determining whether one is looking at a monopoly which violates or does not violate the Sherman Act (so far as those factors are applicable to this case):

"'*  *  * in order to constitute a reasonable restraint of trade, competitors must not be oppressed or coerced; prices must not be arbitrarily fixed or maintained; the quality must not be impaired so that the old price buys a worse article  *  *  * The fundamental test is a detriment to the public. All the circumstances surrounding the. contract should be taken into consideration. The court should consider the relationship of the parties and their relation with the subject matter dealt with, and its relation with the general public, the facts peculiar to the business, its condition before and after the restraint was imposed, the purpose or end sought to be attained.'

"We shall attempt an analysis of the facts in this case in light of these factors, not necessarily in the order mentioned above.

"1. *All the circumstances surrounding the contract and the relationship of the parties.* Mercy Hospital has served the City of Jackson and its environs since 1915. In the late 1960's the sisters who operated the hospital were confronted with two problems, (i) they were unable to attract nuns in sufficient numbers to staff the hospital, (ii) in order to meet state standards, they would have to spend several millions of dollars in renovations. This would require them to assume a debt which they felt unable to meet. In 1973, they publicly announced their decision to withdraw from operation of the hospital, and invited the citizens of the area to assume ownership and operation of the hospital. For 15 months, the sisters engaged in negotiations with a group, composed in part of these plaintiffs, directed to that end. When these negotiations collapsed, the contract of sale which is before us was entered into between Mercy and Foote.

"This situation contains some of the element of 'economic necessity' found by our Supreme Court in *Attorney General, ex rel. State Banking Commissioner v Michigan National Bank; Grand Ledge State Bank v State Banking Commissioner,* 377 Mich 481 [141 NW2d 73] (1966), as a justification for permitting the reduction of banking services in the City of Grand Ledge from two to one bank. Another aspect of the Grand Ledge merger situation which the court looked upon with

favor was the 'open and competitive bidding' by two outside banks prior to the merger. Although our record does not reveal competitive bidding between Foote and any other bidder, it was only after 15 months of negotiations between Mercy and other interested parties failed that Foote entered the picture. In the absence of evidence to the contrary, Foote's offer, made only after another offer had been rejected, points to a purpose other than one to restrict trade or commerce. Surely lacking here is the picture of 'high finance and less lofty subterfuge' which the court found so repugnant in *Peoples Savings Bank v Stoddard,* 359 Mich 297 [102 NW2d 777] (1960).

"2. *The parties relation with the subject matter dealt with and its relation to the general public.* Both Mercy and Foote and their predecessors, have been in the health care business for many years, and it is probably safe to say that between them they have provided most of the health care for the residents of the City of Jackson and the immediately surrounding area. Nothing in the record indicates that either party has offered any specialized hospital care which could characterize them as other than general hospitals. The single difference between them may be that Mercy espoused a pro-life philosophy and Foote did not.

"One witness testified that the 'primary service area' for both Mercy and Foote was Jackson County. On the other hand, the testimony of other witnesses indicated that a substantial number of Jackson County residents use hospitals in adjoining counties. It does not appear from this record that Foote and Mercy, before their contract, enjoyed a hospital care monopoly in Jackson County, or that Foote enjoys one since their contract, either geographically or as to types of service offered. Additionally, as to the service aspect of the claimed monopoly, the record indicates that while Foote is now the only allopathic hospital left in Jackson County, osteopathic doctors serve on its staff as well as on the staff of the county's only osteopathic hospital. This issue is probably made moot however by the evidence to the effect that the distinctions between allopathy and osteopathy are rapidly disappearing if not already extinct.

"3. *The facts peculiar to the business.* The hospital

care business in Michigan is a highly regulated industry. Cost containment restrictions are imposed upon all hospitals not only by state but by federal agencies. In addition, cost controls are imposed indirectly by the three major third party payors (Blue Cross/Blue Shield, Medicare and Medicaid) as a result of the restrictions which they attach to their hospital reimbursement. Although, none of the agencies can absolutely control a hospital's costs or charges, it is safe to say that both of these items are highly controlled. Likewise, through their sanctions, these agencies are able to exercise a measure of control over the quality of physical plant, equipment and care.

"4. *The condition of the industry before and after the contract.* This is directed to the quality of care and the level of patient care charges, before and after the contract of merger. Plaintiffs offered no proofs as to the quality of care at either Mercy or Foote, either before or after the merger, so one must assume that it is at least no worse now than it was before.

"Plaintiffs' witness, Furlong and Denton, testified that the situation since the merger places it within the power of Foote to control prices without limitations. This flies in the face of existing facts: a plaintiffs' witness testified that the cost of a bed in the intensive care unit had gone from $111.00 per day at Mercy in 1974 to $269.00 per day at Foote in 1978. No information was supplied concerning what portion of the increase resulted from inflation. His testimony that the highest cost for intensive care unit care elsewhere in the state in 1978 was $190.00 was contradicted by testimony of defendant's witness who testified that hospitals comparable to Foote and with comparable ICU charged between $200.00 and $300.00 per day. Defendant's witness further testified that patient per day cost at Foote for the 12 month period ending March 31, 1978, was $167.00, and that the average for the twenty-six other hospitals within the same category for the same period was $190.00.

"Summing up, I cannot find a monopoly in this record. And if one does exist, I find no intent to restrict trade thereby, nor any such restriction in fact.

"In view of the rulings herein on the issues of ultra

vires conduct and violation of the anti-trust laws, it is not necessary to discuss the issues of estoppel and laches raised by defendants.

"Judgment may enter for defendants in accordance with this Opinion. No costs, a public question being involved.

"Dated February 7, 1979.

/s/ Richard Robinson
Circuit Judge."

In recognizing the wisdom of this trial court opinion, we are not unmindful of the factors that prompted plaintiffs' actions. It is difficult to accept change, especially where, as here, a hospital facility, owned and operated by the Sisters of Mercy for so many years, is sold. Many emotions are aroused when such a sudden transfer occurs. Historical, ethnic, and sentimental values all come into play with the emphasis placed on preservation.

On the other hand, however, neighborhoods and businesses, including non-profit organizations, as here, do change with the times. This might be for any number of reasons. In the instant case, it was mainly due to financial pressures. Realistically, when all the legal arguments are set aside, what we have here is a sale from a willing seller to a willing buyer. Our sympathies go out to the plaintiffs who might feel abandoned by this transaction. Legally, however, we deem it to be a proper one.

Affirmed; defendants' cross-appeal is dismissed. No costs, a quasi-public question being involved.