The PEOPLE of the State of Colorado ex rel. Duane WOODARD, Attorney General, Plaintiff-Appellee,

v.

The COLORADO SPRINGS BOARD OF REALTORS, INC., Defendant-Appellant.

No. 82SC209.

Supreme Court of Colorado, En Banc.

Dec. 17, 1984.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard Forman, Sol. Gen., Thomas P. McMahon, Asst. Atty. Gen., Denver, for plaintiff-appellee.

Darrell D. Thomas, Colorado Springs, Gorsuch, Kirgis, Campbell, Walker & Grover, John L. Ferguson, Denver, for defendant-appellant.

John R. Linton, Robert D. Butters, Chicago, Ill., for amicus curiae Nat. Ass'n of Realtors.

KIRSHBAUM, Justice.

Pursuant to C.A.R. 50, we granted certiorari to review the trial court's judgment after a trial to the court concluding that certain membership practices of the Colorado Springs Board of Realtors (the Board) constituted an unreasonable restraint of trade in violation of section 6–4–101, 2 C.R.S. (1984 Supp.), and ordering the Board to amend certain provisions of its bylaws. The Board argues that the trial court applied erroneous legal standards to the evidence, failed to enter sufficient findings of fact, and, alternatively, entered an injunction which is impermissibly broad. We reverse and remand for further proceedings.

A brief summary of the procedural history of this case and of the trial court's remedial order will prove helpful. On September 6, 1978, the State of Colorado filed a civil action against the Board seeking injunctive relief on the basis of two claims of alleged antitrust violations. The first claim asserted that the Board's refusal to publish flat fee listings in a Multiple Listing Service (MLS) it produced constituted price-fixing and an unreasonable restraint of trade. The second claim alleged that Board restrictions on access to the MLS also constituted an unreasonable restraint of trade. The complaint requested injunctive relief to restrain these alleged statutory violations.[1]

---

1. Section 6–4–105, 2 C.R.S. (1973), expressly authorizes injunctive proceedings to restrain or prevent violations of the provisions of § 6–4–101, 2 C.R.S. (1984 Supp.).

At the conclusion of the State's evidence, the trial court granted a motion by the Board to dismiss the first claim as moot. With respect to the second claim, the trial court concluded on the basis of all of the evidence that the Board's conduct constituted an illegal restraint of trade and enjoined the Board "from adopting, publishing or enforcing any requirement for ... membership not necessary to the efficient operation of the multiple listing service, and to refrain from imposing any initiation fee or membership dues to be [disbursed] for any purpose not necessary" to that end.[2]

## I

The following facts are material to the resolution of the legal questions posed by this appeal. The Board is a non-profit voluntary trade association whose membership in 1978 included approximately 1,800[3] licensed real estate brokers (Class A members) and salespersons (Class B members). The Board is a member of the National Association of Realtors (NAR) and has as its primary trade area El Paso County, Colorado. Licensed real estate brokers may become Class A members of the Board by demonstrating compliance with the following requirements: (1) a valid real estate broker license; (2) a place of business within the Board jurisdiction and (3) in compliance with local zoning regulations; (4) a favorable business reputation; (5) a sound credit rating; (6) completion of the Board Indoctrination Course; (7) intent to abide by NAR's Code of Ethics; and (8) intent to abide by all rules of the local, state and national organizations. In recent years, no applicant has been denied Board membership for any reason.

By virtue of membership in the Board, one automatically becomes a member of the Colorado Board of Realtors and of NAR, and is, by virtue of the latter membership, entitled to use the trademark "REALTOR." Members agree to abide by NAR's Code of Ethics and to submit disputes with other Board members to binding arbitration. The Board provides certain services to its members, such as continuing educational programs, and operates the MLS. Only broker members may become members of the MLS; thus, access to the

---

In its prayer for relief, the State requested the following injunctive relief:

3. That the court enjoin and restrain [the Board], certain of its members and other co-conspirators from, in any manner, directly or indirectly, continuing, maintaining, or renewing the alleged combination and conspiracy or from engaging in any other combination, conspiracy, contract, agreement, understanding or concert of action having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect.

....

5. That the court enjoin and restrain [the Board] and its members from adopting, maintaining or enforcing any by-law, rule, regulation, code of ethics, or any other provision which requires that a licensed real estate broker or salesperson become a [Board] member before obtaining access to the MLS and the MLS Catalog.

6. That the court order and direct [the Board] to admit to membership and to allow participation in the MLS to any licensed real estate broker or salesperson who pays a *pro rata* share of the fees necessary to maintain the MLS.

7. That the court order such other relief as it may deem just and proper.

**2.** The district court's order is reported unofficially as *State ex rel. MacFarlane v. Colorado Springs Board of Realtors, Inc.*, 1980–81 Trade Cases (CCH) Parag. 63,653 (Colo.Dist.Ct.1980).

**3.** From licensee information provided by the Colorado Real Estate Commission, the Board prepared the following statistics which were admitted into evidence:

| | |
|---|---|
| Total number of Licensees | 4,462 |
| Number of Brokers | 752 |
| Number of Salesmen | 3,710 |

Also, the Board's membership roster yielded the following evidence:

| | |
|---|---|
| Total Members | 1,799 |
| Class A Principals [brokers] | 334 |
| Class B [sales agents] | 1,465 |
| Reported Licensees & Applicants Associated with Class A REALTORS | 695 (Non-Members) |

At trial, the executive vice president of the Board testified that these totals represented active Board members. It is unclear whether the 4,462 licensees included only those active in the real estate trade. Nor was evidence presented on the proportion of Board members and their associates that belong to and utilize the MLS.

MLS depends upon compliance with the eight requirements for Class A Board membership. Nevertheless, participation in the MLS is open to non-broker members and to non-Board members who associate themselves with broker-members upon the payment of certain fees.[4]

The MLS provides a medium for exchange of information about property for sale in El Paso County, including improved residential real estate. It publishes weekly catalogs containing descriptive listings of such real estate, as well as quarterly "sold properties" catalogs which state the sale price, days on the market and other information about listed properties that have been sold. MLS publications are available to all member brokers and to all salespersons employed in a member broker's office.

Within seventy-two hours of receiving an "exclusive right to sell" contract for single-family homes or buildings with four or fewer living units, an MLS member is required to submit a listing describing the property for MLS publication.[5] The listing constitutes an offer of subagency by the listing broker to other MLS members to procure a buyer in exchange for a percentage of the sale commission. Although MLS members may not disclose listings to non-members without the consent of the listing broker, non-members may participate in cooperative sales arrangements with members on listed properties. Not all Class A Board members choose to utilize the MLS.

Improved residential property sales constituted 73% and 83% of all real estate sales in El Paso County in 1978 and 1979, respectively. Property listed with the MLS accounted for 74.7% and 61% of all residential property sales in those respective years. Furthermore, "co-op sales," sales consummated by the joint efforts of two MLS members, constituted a large portion of the residential real estate sales in the county.[6]

4. In 1978, Class A members of the Board paid a $500 initiation fee and annual dues of $155. Class B members paid a $30 initiation fee and yearly dues of $72.50. If these members were associated with an MLS member, they also paid $4.00 per month to the MLS. Identical yearly and monthly charges—$72.50 and $4.00 respectively—were assessed against MLS members for each non-member associated with them.

Proceeds from the MLS listing fees, catalog sales and membership dues are apportioned between the Board and the MLS. For example, each listing submitted to the MLS costs $4.50, $2.50 of which goes to the MLS and the remaining $2.00 to the Board. Weekly listings catalogs sell for $2.80 each, of which $.08 is retained by the Board.

5. In order to have property listed in the MLS catalogs, the owner must agree to an exclusive right to sell contract. Under such a contract, as the name implies, the listing broker reserves the exclusive right to sell the property, but other MLS members, acting as the listing broker's subagents, may procure the buyer in exchange for a percentage of the commission. An owner may, of course, market his home by himself or list his property with only one broker. The latter arrangement, known as an "Office Exclusive," will not be published or distributed by the MLS, but MLS members must report such listings to the service. In addition to single-family homes and buildings with four or fewer living units, a member may list other residential property, including buildings of more than four living units, property of more than ten acres, farms and ranches.

6. The trial court's statistical findings are based upon figures compiled by the County Assessor and the State's expert witness. The Board assails the reliability of the statistics. It points out that the Assessor's totals reflected only transactions recorded by deed and omitted sales evidenced by executory contracts or installment land contracts. Furthermore, the Assessor admitted that his office's practice of tabulating only the most recent transaction for any single piece of property would under-count the sales of property that had changed hands more than once in the two-year statistical period he reported. The Assessor agreed that several hundred such sales could have been untallied.

With respect to the totals of MLS property sales compiled by the State's expert witness, the Board notes that they were based on information reported by MLS members in the Sold Properties Catalogs with no verification that all MLS members reported their figures. Thus, the actual share of MLS-listed sales to total residential sales could be inaccurate. In this regard, we note that the trial court's order misreported some of the percentages reflecting this ratio as the ratio of "co-op sales" to total residential sales.

Such errors do not necessarily invalidate the use of this statistical evidence by the trial court. The trial court could have assumed that the unrecorded transactions, representing only a

In its final order, the trial court concluded that the MLS is the most effective marketing device for the improved residential real estate market in El Paso County, is vital to the coordination of cooperative sales and is a necessary research tool for real estate agents. It then entered the following finding:

6. In El Paso County access to the Multiple Listing Service is tied to membership in the Colorado Springs Board of Realtors. This arrangement carries with it the power to regulate competition in the improved residential real estate market, and that power has been exercised in the past to discourage the use of fixed fee listings and to discourage the employment of part time agents.

Noting four general features of membership requirements which it deemed necessary for an MLS to "promote competition" in the improved residential real estate market, the trial court found the Board's actual membership criteria generally consistent with those standards. However, it also found that the requirement that members' offices must comply with local zoning regulations was immaterial to the efficient operation of the MLS and had "the anti-competitive potential of being used to exclude more marginal or part time brokers" from the MLS. The trial court then entered the following critical findings and conclusions:

11. Although no evidence showed that any application for membership in the Colorado Springs Board of Realtors has been refused in recent years for any reason, the power of that organization to tie membership in it to access to the multiple listing service is per se a combination restraining competition in the improved residential real estate market, un-less that requirement can be justified under the rule of reason.

12. The great majority of the membership requirements and duties of membership adopted by the ... Board ... are necessary to the efficient operation of the multiple listing service. The proceeds realized from initiation fees and dues are primarily disbursed for purposes necessary to the efficient operation of the multiple listing service, and these benefits, along with the advantages of coordination and support by a nationwide organization, bring the t[y]ing arrangement within the scope of the rule of reason, providing that any requirements or expenditures not related to the efficient operation of the multiple listing service are eliminated.

Based on these findings, the trial court entered an injunction containing certain general guidelines for amendment of the Board's bylaws.

## II

■ We first delineate the legal standards applicable to the question of whether the Board's membership practices or policies constitute an illegal restraint of trade under the provisions of section 6-4-101. The present Colorado antitrust statute, though directly based on the substantive provisions of its counterpart in Wisconsin, is rooted in the philosophy of unfettered economic competition articulated by Congress in the sweeping language of the Sherman Anti-Trust Act of 1890 (codified, as amended, at 15 U.S.C. § 1 *et seq.* (1982)), and its companion, the Clayton Act of 1914 (codified, as amended, at 15 U.S.C. § 12 *et seq.* (1982)). As we recently observed in *People v. North Avenue Furniture & Ap-*

---

small fraction of the total, would conform, in percentage terms, with the recorded ones. Moreover, even adjusting the figures in excess of the maximum error admitted by the Assessor—*i.e.,* adding 1,000 to the total transaction figures—the ratio of MLS-listed residential property sales to all county residential transactions remains high: 55.5% (instead of 61%) for 1979 and 68% (instead of 74.7%) for 1978. And, the ratio of "co-op sales" to total county residential sales falls just slightly: 33% (instead of 36%) for

1977 and 41.3% (instead of 46%) for 1978. The under-reporting of MLS sales, on the other hand, could only strengthen the State's case because any increase would raise the ratio of MLS sales and co-op sales *vis-a-vis* all residential sales. The statistical evidence fully supports the basic findings of the trial court that most residential real estate sold in El Paso County was sold by Board members with access to the MLS and that residential sales comprised a major portion of all real estate transactions.

*pliance, Inc.,* 645 P.2d 1291 (Colo.1982), because our statute is intended to protect the public from illegal restraints of trade beyond the reach of federal law, decisions of federal courts construing the Sherman and Clayton Acts, although not controlling, are entitled to careful scrutiny in resolving issues arising under Colorado's antitrust statute. Of course, decisions from other jurisdictions arising under antitrust statutes similar to Colorado's act also merit close analysis.[7]

Section 6-4-101, 2 C.R.S. (1984 Supp.), states as follows:

> **Illegal restraint of trade.** Every contract or combination in the nature of a trust or conspiracy in restraint of trade or commerce is declared illegal. Every combination, conspiracy, trust, pool, agreement, or contract intended to restrain or prevent competition in the supply or price of any article or commodity constituting a subject of trade or commerce in this state, or every combination, conspiracy, trust, pool, agreement, or contract which controls in any manner the price of any such article or commodity, fixes the price thereof, or limits or fixes the amount or quantity thereof to be manufactured, produced, or sold in this state, or monopolizes or attempts to monopolize any part of the trade or commerce in this state, is declared an illegal restraint of trade.[8]

While the broad language of the statute literally encompasses almost every business arrangement, it is noteworthy that the Supreme Court, in construing parallel language of the Sherman Act, has found that the Congress sought only to control commercial arrangements which, because they result in the anti-competitive evils associated with monopoly, must be deemed unreasonable. *See, e.g., National Society of Professional Engineers v. United States,* 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); *Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). As Justice Brandeis stated in oft-quoted language in *(Chicago) Board of Trade v. United States:*

> Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or

---

7. Numerous federal and state decisions have addressed various questions directed to restrictions imposed on access to multiple listing services. *See United States v. Realty Multi List, Inc.,* 629 F.2d 1351 (5th Cir.1980); *Murphy v. Alpha Realty, Inc.,* 1978–2 Trade Cases (CCH) ¶ 62,388 (N.D.Ill.1978); *Martin-Trigona v. National Ass'n of Realtors,* 1978–1 Trade Cases (CCH) ¶ 61,915 (E.D.Ill.1978); *Brown v. Indianapolis Board of Realtors,* 1977–1 Trade Cases (CCH) ¶ 61,435 (S.D.Ind.1977); *Oglesby v. Metro MLS, Inc.,* 1976–2 Trade Cases (CCH) ¶ 61,064 (E.D.Va.1976); *Marin County Board of Realtors, Inc. v. Palsson,* 16 Cal.3d 920, 130 Cal.Rptr. 1, 549 P.2d 833 (1976); *People v. National Ass'n of Realtors,* 155 Cal.App.3d 578, 202 Cal.Rptr. 243 (1984); *People v. National Ass'n of Realtors,* 120 Cal.App.3d 459, 174 Cal.Rptr. 728 (1981); *Glendale Board of Realtors v. Hounsell,* 72 Cal. App.3d 210, 139 Cal.Rptr. 830 (1977); *Blake v. H–F Group Multiple Listing Service,* 36 Ill.App.3d 730, 345 N.E.2d 18 (1976); *State v. Cedar Rapids Board of Realtors,* 300 N.W.2d 127 (Iowa 1981);

*Grempler v. Multiple Listing Bureau,* 258 Md. 419, 266 A.2d 1 (1970); *Barrows v. Grand Rapids Real Estate Board,* 51 Mich.App. 75, 214 N.W.2d 532 (1974); *Pomanowski v. Monmouth County Board of Realtors,* 89 N.J. 306, 446 A.2d 83 (1982), *cert. denied,* 459 U.S. 908, 103 S.Ct. 213, 74 L.Ed.2d 170 (1982); *Oates v. Eastern Bergen County Multiple Listing Service, Inc.,* 113 N.J.Super. 371, 273 A.2d 795 (1971); *Grillo v. Board of Realtors,* 91 N.J.Super. 202, 219 A.2d 635 (1966); *Collins v. Main Line Board of Realtors,* 452 Pa. 342, 304 A.2d 493 (1973), *cert. denied,* 414 U.S. 979, 94 S.Ct. 291, 38 L.Ed.2d 223 (1973).

8. This section has not been amended since its original enactment. However, it has been reprinted in the C.R.S. Supplement to correct a typographical or printing error made in the preparation of C.R.S. 1973, wherein the words "or every combination, conspiracy, trust, pool, agreement, or contract" were missing from the text.

probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918). We conclude that section 6–4–101, as does its federal counterpart, reaches only those contracts or combinations in restraint of trade which unreasonably restrain trade or are designed to destroy competition in a particular market.

■ In assessing whether particular trade arrangements violate the prohibitions of the first section of the Sherman Act, the Supreme Court has developed two categories of analysis. The first category consists of "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal." *Northern Pacific Ry. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Such arrangements are considered "illegal *per se*." *National Society of Professional Engineers*, 435 U.S. at 692, 98 S.Ct. at 1365. *See also Standard Oil Co. v. United States, supra.* Practices which fall within the *per se* category may include price-fixing agreements, division of markets, group boycotts, and certain tying arrangements. *Northern Pacific Railway, supra.* In such circumstances, unreasonable anti-competitive results are presumed and no economic evidence is required to establish the anti-competitive impact of such practices on the affected market. *See* Johnson & Ferrill, *Defining Competition: Economic Analysis and Antitrust Decision Making*, 36 Baylor L.Rev. 583 (1984).

The Supreme Court developed this presumption after experience with cases demonstrating that the purpose of a particular agreement, whether in the form of a group boycott, a price-fixing scheme, or a tying arrangement, was to reduce or eliminate competition. *See, e.g., United States v. Topco Associates, Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); Van Cise, *The Future of Per Se in Antitrust Law*, 50 Va.L.Rev. 1165 (1964). The question of whether a particular agreement or arrangement constitutes a *per se* antitrust violation has become more difficult to answer, however, as courts have been required to apply the provisions of the Sherman Act to practices which appear to fall within familiar *per se* categories but arise in diverse and relatively unfamiliar commercial contexts. *See Jefferson Parish Hospital District No. 2 v. Hyde*, —— U.S. ——, ——, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984).

■ The second category of analysis is applied to agreements or combinations whose lawfulness or unlawfulness must be determined not by application of a presumption of unreasonable anti-competitive impact, but by an actual balancing of procompetitive and anti-competitive effects on a particular market. This latter approach, termed the "rule of reason" analysis, was initially articulated by the Supreme Court in *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), and more fully explained in *(Chicago) Board of Trade v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918). *See also National Society of Professional Engineers v. United States, supra; Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). As the history of federal antitrust litigation makes clear, a business arrangement which does not *per se* violate antitrust law nevertheless may be found to constitute an illegal arrangement under the rule of reason analysis. *See Jefferson Parish Hospital District No. 2 v. Hyde, supra. See generally*, Johnson & Ferrill, *supra.* In view of the broad language of section 6–4–101, we conclude that any particular business agreement, combination or arrangement may in some circumstances be determined to constitute a *per se* violation of the statute, without the necessity of

proving actual anti-competitive impact on the particular market involved.

Thus, in determining whether particular conduct violates section 6–4–101, a trial court must normally determine initially whether the challenged arrangement is illegal *per se. See Broadcast Music, Inc. v. Columbia Broadcasting System*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979). This determination can be made only after the alleged illegal practice and the relevant commercial setting are clearly identified. *Compare id.* (blanket copyright licenses issued by composers' associations, although a form of "price-fixing," not illegal *per se* ) *with Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982) (price-fixing by physicians illegal *per se* ). Merely labeling a particular practice as a "group boycott," a "price-fixing" scheme, or a "tying" arrangement is insufficient to establish that the practice is a *per se* violation of antitrust law. If no *per se* violation is established, the court may be required to apply the rule of reason analysis to the challenged conduct.

Decisions which have dealt with antitrust challenges to restrictions imposed by local, state or national real estate organizations on access to multiple listing services have been rendered in the context of a variety of theories in federal and state courts, with predictably varied results. *See United States v. Realty Multi-List, Inc.*, 629 F.2d 1351 (5th Cir.1980) (membership criteria of private multiple listing service may constitute an unlawful group boycott under Sherman Act under rule of reason analysis); *Marin County Board of Realtors, Inc. v. Palsson*, 16 Cal.3d 920, 130 Cal.Rptr. 1, 549 P.2d 833 (1976) (membership criteria of corporation restricting access to multiple listing service to members and limiting membership to persons primarily engaged in real estate constitute violations, under rule of reason test, of California antitrust statute); *People v. National Association of Realtors*, 155 Cal.App.3d 578, 202 Cal.Rptr. 243 (1984) and *People v. National Association of Realtors*, 120 Cal.App.3d 459, 174 Cal.Rptr. 728 (1981) (various practices and rules of local, state and national associations constitute price-fixing, group boycotts and tying arrangements which, under both *per se* and rule of reason analysis, violate California antitrust statute); *Blake v. H-F Group Multiple Listing Service*, 36 Ill. App.3d 730, 345 N.E.2d 18 (1976) (agreement between four real estate companies not to deal with real estate brokers who were not members of a multiple listing service produced by the companies does not violate either of two sections of Illinois antitrust statute, which statute requires *per se* analysis for certain conduct and rule of reason analysis for other conduct); *State v. Cedar Rapids Board of Realtors*, 300 N.W.2d 127 (Iowa 1981) (on the evidence, under rule of reason analysis, no violation of Iowa antitrust statute by private association's membership policy restricting access to multi-listing service to members); *Grempler v. Multiple Listing Bureau*, 258 Md. 419, 266 A.2d 1 (1970) (membership restriction of local corporation is reasonable and does not violate Maryland common law antitrust prohibitions); *Barrows v. Grand Rapids Real Estate Board*, 51 Mich.App. 75, 214 N.W.2d 532 (1974) (requirement of membership in local board for access to multiple listing service did not constitute a monopoly or any other illegal restraint of trade, under rule of reason test, under Michigan common law and antitrust statute); *Pomanowski v. Monmouth County Board of Realtors*, 89 N.J. 306, 446 A.2d 83 (1982), *cert. denied*, 459 U.S. 908, 103 S.Ct. 213, 74 L.Ed.2d 170 (1982) (requirement of membership in local trade association for access to multiple listing service operated by the association does not, under rule of reason analysis, constitute antitrust violation); *Oates v. Eastern Bergen County Multiple Listing Service*, 113 N.J.Super. 371, 273 A.2d 795 (1971) (refusal of local multiple listing service corporation to admit minority realtor to membership constitutes concerted refusal to deal which, under *per se* analysis, violates common law antitrust doctrine); *Grillo v. Board of Realtors*, 91 N.J.Super. 202, 219 A.2d 635 (1966) (membership practice of

local corporation constitutes group boycott, under rule of reason analysis, prohibited by New Jersey common law); *Collins v. Main Line Board of Realtors*, 452 Pa. 342, 304 A.2d 493 (1973), *cert. denied*, 414 U.S. 979, 94 S.Ct. 291, 38 L.Ed.2d 223 (1973) (membership practices of corporation constitute group boycott, under *per se* analysis, in violation of Pennsylvania common law). *See generally*, Annot., *Application of State Antitrust Laws to Activities or Practices of Real-Estate Agents or Associations*, 22 A.L.R. 4th 103 (1983). Although the majority of the reported decisions have been decided on group boycott theories, allegations of illegal tying agreements and price-fixing arrangements have also been made in the real estate multiple listing service cases.

In the present case, the first claim alleges that the Board's refusal to publish fixed fee information constituted illegal price-fixing. At the conclusion of the State's case-in-chief, the trial court ruled that, although this arrangement did constitute price-fixing and amounted to a *"per se"* violation of section 6–4–101, the issue was moot because the practice had been discontinued. The trial court then dismissed the first claim, although it referred to this prior practice in its ruling with regard to the second claim. This ruling has not been appealed; therefore, we do not consider this aspect of the trial court's decision.

The second claim alleges a separate ongoing "combination and conspiracy in unreasonable restraint of trade and commerce." The following paragraphs of the second claim indicate the precise basis of the State's position:

14. This combination and conspiracy consists of a continuing agreement, understanding and concert of action among defendant [Board], certain of its members and co-conspirators to create anti-competitive restrictions and entry barriers to the use of the MLS and the MLS Catalog by excluding certain licensed real estate brokers and salespersons from the MLS.

15. In effectuating this combination and conspiracy, defendant [Board], certain of its members and other co-conspirators did certain things which they combined and conspired to do, including, among other things:

(a) Conditioning access to the MLS by licensed real estate brokers and salespersons upon membership in [Board];

(b) Refusing to provide the listings published in the MLS Catalog to licensed real estate brokers and salespersons who are not members of [Board];

(c) Threatening to subject [Board] members to disciplinary measures, including suspension or exclusion from the [Board], for allowing non-member licensed real estate brokers and salespersons access to the MLS and the MLS Catalog.

. . . .

16. The foregoing combination and conspiracy has had the following effects, among others:

(a) Certain licensed real estate brokers and salespersons have been and continue to be unreasonably deprived of a valuable and essential business service which is necessary for them to compete effectively in the El Paso County real estate market; and

(b) Consumers of real estate services have been and continue to be deprived of the benefits of unrestricted competition in the sale and purchase of residential real properties.

Although the trial court's order refers to Board practices found to have constituted an illegal price-fixing arrangement, the second claim does not incorporate by reference the price-fixing allegations of the first claim. The record indicates that the trial of the second claim was similarly affected by some ambiguity concerning applicable standards and relevant evidentiary inquiries. Nevertheless, the second claim's allegations are sufficient to indicate the State's position that the restrictions on access to the MLS constitute either a tying arrange-

ment or a group boycott which violates the provisions of section 6–4–101.

In paragraph 11 of its order, quoted *supra,* the trial court states that the Board's ability to tie Board membership to access to the MLS is *"per se"* a restraint of trade in the improved residential real estate market in El Paso County "unless that requirement can be justified under the rule of reason." The Board argues that this language, coupled with the trial court's finding that the Board's membership and fee practices are fundamentally reasonable, requires the conclusion that no antitrust violation of any kind occurred. The State argues that this language indicates a conclusion by the trial court that the conduct complained of in the second claim constitutes a tying arrangement or a group boycott which, in either event, is prohibited by section 6–4–101. For the reasons stated below, the case must be remanded to the trial court for more particularized findings and for application of appropriate legal standards.

### III. Tying Arrangement

We conclude that the facts found by the trial court do not permit the conclusion that the membership practices and policies challenged by the second claim constitute the type of tying arrangement prohibited by section 6–4–101. The essential characteristic of any tying arrangement is an agreement to sell one product but only on the condition that the buyer also purchase a different (or tied) product. As articulated by the Supreme Court in the context of an alleged violation of the Sherman Act, tying arrangements constitute unreasonable restraints of trade "in and of themselves [*per se* ] whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected." *Northern Pacific Ry.,* 356 U.S. at 6, 78 S.Ct. at 518. *See also Standard Oil Co. v. United States,* 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949); *International Salt Co. v. United States,* 332 U.S. 392, 68 S.Ct.

12, 92 L.Ed. 20 (1947). Such practices are prohibited because they restrict the access of competitors to the market in the tied product, resulting in higher prices and reduced choices to consumers.

However, the fact that goods or services are sold in combination does not establish a prohibited tying arrangement; "every refusal to sell two products separately cannot be said to restrain competition." *Jefferson Parish Hospital District No. 2,* —— U.S. at ——, 104 S.Ct. at 1558 (1984). *See Fortner Enterprises Inc. v. United States Steel Corp.,* 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed.2d 1277 (1953). Of course, a tying arrangement not illegal *per se* nevertheless may be violative of antitrust laws under a rule of reason analysis when its anti-competitive impact on the market for the tied product outweighs any pro-competitive effect the practice has on that market. *See Times-Picayune Publishing Co. v. United States, supra.*

The distinguishing features of tying arrangements which constitute illegal restraints of trade *per se* are (1) the exploitation by a seller of the seller's market superiority in the tying product to coerce or force the purchase of the tied product by buyers who might not purchase the latter if permitted to exercise independent and unfettered marketplace judgment, and (2) a resulting restraint upon a not insubstantial portion of the market for the tied product. *Jefferson Parish Hospital District No. 2 v. Hyde, supra; Times-Picayune Publishing Co. v. United States, supra.* Such arrangements "deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his power or leverage in another market." *Northern Pacific Ry.,* 356 U.S. at 6, 78 S.Ct. at 518. Therefore, analysis of whether a particular tying arrangement constitutes a *per se* violation of antitrust prohibitions must include precise definitions of the two particular products and product markets involved, a

careful delineation of the seller's market strength in the tying product, and a detailed description of the amount of commerce in the tied product affected by the challenged practice.

In this case, we find no basis to conclude that the tying arrangement challenged by the State constitutes a *per se* violation of section 6–4–101. As recognized by the State, the relevant products consist of the MLS (the tying product) and Board memberships (the tied product). Initially, it must be observed that the trial court's conclusion that the Board and the MLS constitute a single entity somewhat obscures the necessary analysis of the particular tying arrangement here challenged. It might be argued, for example, that in such circumstances there can be no separate markets for "MLS services" and "Board memberships." *Cf. Boddicker v. Arizona State Dental Association*, 680 F.2d 66 (9th Cir. 1982), *cert. denied*, 459 U.S. 837, 103 S.Ct. 83, 74 L.Ed.2d 79 (1982). More significantly, however, the trial court has neither found nor intimated that the Board used its position of exclusive control of the MLS to coerce brokers and salespersons to purchase memberships in the Board. Furthermore, uncontroverted evidence established that non-Board members can gain access to the MLS in certain circumstances and that not all Board members participate in the MLS. Finally, the evidence does not establish the extent of any market for either MLS services or Board memberships. Given these circumstances, and in the absence of any findings or conclusions by the trial court that the Board intended to coerce membership purchases by means of its MLS monopoly, no *per se* illegal tying arrangement was established.

The State relies on *People v. National Association of Realtors*, 155 Cal.App.3d 578, 202 Cal.Rptr. 243 (1984), and *People v. National Association of Realtors*, 120 Cal. App.3d 459, 174 Cal.Rptr. 728 (1981) (*NAR II* and *NAR I*), to support its theory that the tie between the MLS and Board membership here constitutes a *per se* violation of section 6–4–101. Those opinions are distinguishable from the instant case. In

*NAR I*, a division of the California Court of Appeals considered a ruling by the trial court that particular practices of the association did not constitute a group boycott under California's antitrust statute. The trial court did not address the State's alternative theory of illegal tying. On appeal, after announcing legal standards applicable to particular sections of California's antitrust statute, the Court of Appeals reversed and remanded the case for further proceedings to consider whether the practices constituted an impermissible tying arrangement under *per se* principles of analysis. The appellate court indicated that restraint in competition in the tied product market could be inferred from a finding of domination in the tying product market.

On remand, the trial court found all of the elements of *per se* illegality, but ruled that the State's failure to demonstrate actual restraint saved the arrangement from condemnation. On reappeal, in *NAR II*, the Court of Appeals reversed, again pointing out that actual restraint in the market for the tied product need not be established if the practice constitutes a *per se* violation of the antitrust statute. Here, by contrast, the State failed to establish elements necessary to permit the application of a *per se* analysis to the tying arrangement alleged. Therefore, the presumption of market restraint permitted in *NAR I* and *NAR II* is not available.

Similarly, the findings of the trial court do not permit the conclusion that the Board's restriction of access to the MLS to Board members constitutes a tying arrangement which is prohibited by section 6–4–101 under the rule of reason analysis. The trial court did not find that any membership restriction resulted in any anti-competitive impact on the market in Board memberships. Indeed, the trial court found that the Board's membership practices in fact had some pro-competitive effect on the general improved residential real estate market. Thus, while the order does indicate that the court found some evidence of an "anti-competitive" effect, the findings cannot on the whole support

the conclusion that the restriction of access to the MLS to Board members produced any anti-competitive effect on the market for Board memberships. Therefore, to the extent the trial court concluded that the Board's membership policies and practices constituted a tying arrangement prohibited by section 6–4–101 under a rule of reason analysis, the conclusion is erroneous.

## IV. Group Boycott

■■■ As we previously noted, group boycotts may constitute violations of antitrust principles under either a *per se* or rule of reason analysis. More importantly, such patterns of practice may in some circumstances constitute no violation of applicable antitrust law. It is, therefore, essential to determine the mode of analysis applicable to the pleadings and evidence presented to the trial court in assessing the judgment it entered.

The term "group boycott" refers to a concerted refusal by traders to deal with competitors. *See Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 75 S.Ct. 705, 3 L.Ed. 741 (1959). When isolated in federal cases involving internecine commercial warfare, the term invariably was employed to describe conduct designed to isolate and ultimately destroy competition and, therefore, considered a *"per se"* violation of the Sherman Act. *See, e.g., id.* (large chain store influenced appliance manufacturers to alter terms or terminate supplies to single merchant competitor with shop next door); *Eastern States Retail Lumber Dealers' Association v. United States*, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914) (retail sellers agreed to boycott wholesalers who sold directly to consumers). Agreements by trade association members to observe trading restrictions established by the association generally have been treated quite differently, however, unless the association controls a commodity essential to that trade and grants members unreasonable power to limit membership or unless the trading restrictions are imposed for the purpose of suppressing competition. *Compare Associated Press v. United States*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945) (unreasonable membership barriers to AP, an essential service, constituted *per se* violation of Sherman Act) *and Fashion Originators' Guild of America, Inc. v. Federal Trade Commission*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed.2d 949 (1941) (refusal of manufacturers' guild to sell its products to certain retailers designed to suppress competition, constituted *per se* violation of Sherman Act) *with (Chicago) Board of Trade v. United States*, *supra* (rule prohibiting members from buying at price other than closing afternoon bid constitutes permissible limit on price-making period which did not affect price or volume) *and Anderson v. United States*, 171 U.S. 604, 19 S.Ct. 50, 43 L.Ed. 300 (1898) (bylaw forbidding "yard trader" members of livestock exchange from dealing with other yard traders did not violate Sherman Act).

Most state courts considering allegations that certain membership practices of trade associations violate state antitrust laws have recognized that the rule of reason provides the proper analytical approach in such cases, for the reason that such membership agreements are rarely intended to destroy competition or establish a monopoly. *See Marin County Board of Realtors, Inc. v. Palsson*, 16 Cal.3d 920, 130 Cal. Rptr. 1, 549 P.2d 833 (1976); *Blake v. H–F Group Multiple Listing Service*, 36 Ill. App.3d 730, 345 N.E.2d 18 (1976); *State v. Cedar Rapids Board of Realtors*, 300 N.W.2d 127 (Iowa 1981); *Barrows v. Grand Rapids Real Estate Board*, 51 Mich.App. 75, 214 N.W.2d 532 (1974); *Pomanowski v. Monmouth County Board of Realtors*, 89 N.J. 306, 446 A.2d 83 (1982), *cert. denied*, 459 U.S. 908, 103 S.Ct. 213, 74 L.Ed.2d 170 (1982); *Grillo v. Board of Realtors*, 91 N.J.Super. 202, 219 A.2d 635 (1966). *See also* Austin, *Real Estate Boards and Multiple Listing Systems as Restraints of Trade*, 70 Colum.L.Rev. 1325, 1341 (1970); Note, *Trade Association Exclusionary Practices: An Affirmative Role for the Rule of Reason*, 66 Colum.L. Rev. 1486 (1966). In determining the impact of challenged conduct on competition under the rule of reason, such factors as

the relative share of the relevant market controlled by those with access to the multi-list service, the overall reasonableness of membership requirements, and the degree of availability of various aspects of the service to non-members have been considered and weighed. *See United States v. Realty Multi-List, Inc.*, 629 F.2d 1351 (5th Cir.1980). Those state courts which have enjoined real estate association membership practices as prohibited group boycotts under a *per se* analysis have emphasized the pervasive crippling effect of such action upon non-members due to concerted and effective exclusionary practices—in effect finding an intent to use monopoly power to stifle or destroy competition. *Collins v. Main Line Board of Realtors*, 452 Pa. 342, 304 A.2d 493 (1973), *cert. denied*, 414 U.S. 979, 94 S.Ct. 291, 38 L.Ed.2d 223 (1973); *Oates v. Eastern Bergen County Multiple Listing Service*, 113 N.J.Super. 371, 273 A.2d 795 (1971).

■■ In this case, the trial court concluded that the membership practices of the Board were not unreasonable, with one exception, and further found that the Board had not rejected a membership application for some time. Its opinion does not suggest that the limited access arrangement was designed to destroy the abilities of competitors of Board members to compete in the improved residential real estate market or in fact restricted the ability of potential sellers and purchasers of homes to enjoy a truly competitive market. In these circumstances, we conclude that the State has not satisfied its burden of establishing that the requirement of Board membership for access to the MLS is a group boycott or refusal to deal with competitors which constitutes a *per se* violation of section 6–4–101.

However, we are faced with a different problem concerning the question of whether, under the rule of reason analysis, the challenged membership practices constitute a group boycott or unwarranted refusal to deal prohibited by section 6–4–101. While the trial court's findings are somewhat inconsistent, a fair reading of the entire or-

der, including the reference to the Board's past price-fixing practice and the statement that the Board's market power has the "anti-competitive potential of being used to exclude more marginal or parttime brokers from membership in the multilisting service," suggests that, although the case was tried primarily upon price-fixing and illegal tying arrangement theories, the trial court may have found sufficient evidence to support a conclusion that the Board's membership practices constituted an impermissible group boycott under the rule of reason analysis. *See United States v. Realty Multi-List, Inc.*, 629 F.2d 1351 (5th Cir. 1980); *Marin County Board of Realtors, Inc. v. Palsson, supra; Grillo v. Board of Realtors, supra.*

■■ Two major impediments thwart any definitive ruling by this court at this time concerning whether the Board's membership practices constitute an impermissible group boycott under the rule of reason: the trial court erroneously applied a combined *per se* and rule of reason test to its findings, and the trial court's order does not contain sufficiently specific findings concerning critical evidentiary conflicts to permit such ultimate ruling. While this court may itself apply the proper legal test to uncontroverted evidence in the record, the evidence here is conflicting with respect to fact questions bearing on the ultimate issue of the relative pro-competitive and anti-competitive effects of the Board's membership practices on the improved residential real estate market in El Paso County. In these circumstances, the trial court is the appropriate fact finder.

We, therefore, conclude that the case must be remanded to the trial court for the entry of specific findings of fact, pursuant to C.R.C.P. 52, and application of the rule of reason analysis to those findings to determine whether the Board's membership practices constitute an illegal group boycott of or refusal to deal with competitors proscribed by section 6–4–101. The trial court should identify those facts it relies upon to define the extent and the mode of operation of the relevant geographic and

product market; to establish the relative economic power of the Board and the MLS in that market and the actual as well as potential economic effects of the combination of that power and the challenged membership practices on that market; to identify the pro-competitive and anti-competitive effects of the challenged practices on that market; and, as it must ultimately conclude, to determine whether the State has met its burden of establishing that the anti-competitive effects of the challenged practices outweigh the pro-competitive effects of those practices in the relevant market.

Because we reverse for the entry of more specific findings and for application thereto of the appropriate legal analysis, we do not address the Board's argument that the injunction entered by the trial court is too broad for meaningful enforcement. If a violation of the Colorado antitrust statute is found by the trial court, any relief should be addressed to the specific practice or practices determined to constitute an unlawful arrangement or agreement in restraint of trade. *See* C.R. C.P. 65.

The judgment is reversed and the cause is remanded for further proceedings consistent with this opinion.